350 F.Supp. 655 (1972)
COMMITTEE FOR PUBLIC EDUCATION AND RELIGIOUS LIBERTY et al., Plaintiffs,
v.
Ewald B. NYQUIST et al., Defendants,
and
Geraldine M. Boylan et al., Intervenor-Defendants,
and
Senator Earl W. BRYDGES, as Majority Leader and President Pro Tem of the New York State Senate, Intervenor-Defendant.
No. 72 Civ. 2286.
United States District Court, S. D. New York.
October 2, 1972.
As Amended October 10, 1972.
*656 *657 Leo Pfeffer, New York City, for plaintiffs.
Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for defendants Nyquist, Levitt and Gallman, by Ruth Kessler Toch, Jean M. Coon, Albany, N. Y., of counsel.
Davis, Polk & Wardwell, New York City, for intervenors-defendants, Boylan, Cherry, Ducey, Ferguson, Ferrarella, Roos and Ruiz; by Porter R. Chandler, Richard E. Nolan, New York City, of counsel.
John F. Haggerty, Brooklyn, N. Y., and Louis P. Contiguglia, Auburn, N. Y., for intervenor-defendant Brydges.
Before HAYS, Circuit Judge, and CANNELLA and GURFEIN, District Judges.
GURFEIN, District Judge:
We are again confronted with the question of the constitutionality of an Act of the New York Legislature relating to nonpublic schools, the children who attend them, and their parents. The plaintiffs are an unincorporated association and individuals who are residents of the State of New York and who pay income taxes and other taxes to that State. Some of the plaintiffs have children attending public schools. The defendants are the Commissioner of Education, the Comptroller and the Commissioner of Taxation and Finance of the State of New York.[1]
Jurisdiction is alleged under United States Code, Title 28, Sections 1331, 1343(3), 2281, 2283, 2201 and 2202. The amount in controversy, exclusive of interest and costs, is alleged to be in excess of $10,000.
By consent of all parties, a motion to convene a three-judge court pursuant to Title 28, Sections 2281 and 2283, was granted, and this Court was convened.
The plaintiffs seek to enjoin the defendants from approving or paying any funds or according tax benefits as provided in the Act to be described. The State seeks a dismissal of the complaint on the merits but asserts no jurisdictional bar to maintenance of the action.
Since no trial has been had, the attack upon the several parts of the Act assumes that they are each facially unconstitutional under the Establishment Clause of the First Amendment to the United States Constitution. The Act (N.Y.Laws of 1972, c. 414) is divided into five parts, three of which are attacked by the plaintiffs as being in violation of the establishment clause which guarantees the separation of Church and State, as applied to the states by the Fourteenth Amendment.[2] These three *658 parts of the statute which are under attack may be summarized as follows:
A. Section 1 provides for grants of money directly from the State Treasury to nonpublic schools for "maintenance" of the buildings if the nonpublic school has been designated during a base year as "serving a high concentration of pupils from low-income families for purposes of Title IV of the Federal Higher Education Act of nineteen hundred sixty-five (20 U.S.C.A. § 425)."[3] If the school qualifies under the federal standard, it is to be given a direct grant of $30 per pupil in attendance, which is increased to $40 per pupil to those schools which are more than twenty-five years old.[4] The grants, which are given directly to the particular nonpublic schools eligible for such grants, are to be in reimbursement of "maintenance and repair" costs incurred in the preceding year. "Maintenance and repair" is defined as "the provision of heat, light, water, ventilation and sanitary facilities, cleaning, janitorial and custodial services; snow removal; necessary upkeep and renovation of buildings, grounds and equipment; fire and accident protection; and such other items as the commissioner [the State Commissioner of Education] may deem necessary to ensure the health, welfare and safety of enrolled pupils." Each qualifying school which seeks an apportionment is required to submit to the Commissioner an application which shall include an audited statement of the expenditures of maintenance and repair of such qualifying school for the base year.
This part of the Act is entitled "Health and Safety Grants for Nonpublic School Children" and is prefaced by certain legislative findings. These recite that: (1) it is the primary responsibility of the state to ensure the health, welfare and safety of children attending both public and nonpublic schools; (2) "[f]inancial resources necessary to properly maintain and repair [deteriorating] buildings are beyond the capabilities of low-income people whose children attend nonpublic schools;" (3) teachers are given incentives by the Federal Government to teach in these poor areas; (4) healthy and safe nonpublic schools contribute to the stability of urban neighborhoods; and finally (5) "[t]o insure a healthy and safe school environment for children attending nonpublic schools, the state has the right to make grants for maintenance and repair expenditures which are clearly secular, neutral and non-ideological in nature."[5]
B. Section 2 of the Act provides for flat tuition grants from the State Treasury to parents with family incomes of less than $5,000 per annum who have children attending elementary or secondary nonpublic schools. The grant is in the sum of $50 a year for children in grades 1 through 8, and $100 in grades 9 through 12. The tuition reimbursement cannot exceed 50% of the actual tuition payment made by the parent. The Commissioner is given "responsibility for the administration of the program" and is given authority to "promulgate such regulations as are necessary to carry out the provisions of this article." *659 This section is entitled "Elementary and Secondary Education Opportunity Program."
Section 2 is prefaced by legislative findings that (1) "[t]he vitality of our pluralistic society is, in part, dependent upon the capacity of individual parents to select a school, other than public, for the education of their children"; (2) the Supreme Court of the United States has recognized this "right" of selection, but the "right" is diminished or denied to children of poor families whose parents have the least options in determining where their children are to be educated; (3) any precipitous decline in the number of nonpublic school pupils would cause a massive increase in public school enrolment and costs which would seriously jeopardize quality education for all children and aggravate an already serious fiscal crisis in public education; and (4) it is a legitimate purpose for the State to partially relieve the financial burdens of parents who provide a nonpublic education for their children.
C. Sections 3, 4 and 5 provide that an individual shall be entitled to subtract, for State income tax purposes, from his Federal adjusted gross income an amount shown in a table for his New York adjusted gross income, multiplied by the number of his dependents, not exceeding three, attending a nonprofit nonpublic school on a full time basis, provided that he has paid at least fifty dollars in tuition for each such dependent.[6] This exclusion may be taken only by parents with adjusted gross incomes of from $5,000 to $25,000 who do not receive a tuition assistance payment under Section 2. The exclusion would be as much as $1,000 for each child, up to three children, enrolled in grades 1 through 12 with the net benefit to taxpayers apparently as shown in note 6, supra. The amount of income that may be excluded is reduced as the individual's adjusted gross income increases. The exclusion is deducted from adjusted gross income and is available to taxpayers whether they itemize or take the standard deduction.
This part of the Act is prefaced by legislative findings (§ 3) that (1) statutes already provide for the deduction from gross income for tax purposes of amounts contributed to religious, charitable and educational institutions; (2) nonpublic educational institutions are entitled to a tax exempt status by virtue of legislation which has been sustained by the courts; (3) by their existence, such educational institutions relieve the taxpayers of the State of the burden of providing public school education for the children who attend nonpublic schools; (4) tax laws also authorize deductions for education related to employment; and (5) similar modifications of Federal adjusted gross income should also be provided to parents for tuition paid to nonpublic schools.
We have stated the legislative findings offered in support of each part of the statute in detail because we wish to make it clear that we accept these findings, except where they purport to state principles of applicable constitutional law. They sum up legislative purposes which are cast as secular in intent. *660 Thus, we must start with the assumption that the Legislature intended to preserve the health and safety of children who attend nonpublic school in low-income areas. Similarly, we must start with the assumption that the Legislature intended to provide a quality education for all children who attend nonpublic schools in low-income areas. Similarly, we must start with the assumption that the Legislature intended to provide a quality education for all children and to nurture a pluralistic society by giving money from the State Treasury to poor parents for tuition in nonpublic schools. And lastly we must assume that taxpayers as a body have, indeed, been relieved up to now of the burden of providing public school education for the children who attend nonpublic schools.
In sum, we do not go behind the statements of the New York Legislature, although it is manifest that, regardless of the variety of secular arguments advanced to support the legislation, the prime legislative concern is to see that religious parochial schools do not go under for lack of financial support. If that is constitutionally permissible, it is a worthy objective and one that should not be lightly set aside in the alleged interest of public education. Both public and nonpublic education can exist side by side. Neutrality forbids discrimination in favor of one system over the other.
Whether the main reason for this legislative concern is the fear that an intolerable financial burden will be cast upon the public schools if the nonpublic schools do go under, or whether the main reason is the survival of religious education, is not the particular judicial concern. We must weigh not only the purpose of the legislation but its effect on the traditional separation of Church and State in this country. As to the former, we accept the legislative statements. As to effect, we must exercise the judicial function of interpreting what effect the legislation will have upon areas protected from invasion by the constitutional guaranty.
This is, in essence, a conflict between two groups of extraordinary good will and civic responsibility. One group fears the diminution of parochial religious education which is thought to be an integral part of their rights to the free exercise of religion. The other group, equally dedicated, believes that encroachment of Government in aid of religion is as dangerous to the secular state as encroachment of Government to restrict religion would be to its free exercise. Since the policy of separating Church from State is not merely one of policy but of constitutional provision, the ultimate determination of such conflicts must rest in the judicial branch. And the judges must be especially careful in this delicate area not to allow their personal predelictions on policy to circumscribe their judgment as to the constitutional effect of particular legislative proposals. We must make a constitutional decision between these two worthy objectives. Yet, as an inferior federal court, we are not permitted to view the religion clauses of the First Amendment in a literal or even in an historical fashion. We have only to determine their meaning as authoritatively expounded by the Supreme Court. We shall, therefore, discuss the constitutionality of each of the three parts of the statute under the guidelines laid down by the Supreme Court as we understand them.

I
The findings of the Legislature in respect of the needs of parochial schools in low income areas must, as we have said, be accepted as fact. For us to delve into the reasons why parochial education is stratified by the boundaries of richer or poorer districts would be improper, for that would be trenching on the prerogatives of religious denominations which must determine their own priorities and administration without State interference under the Free Exercise Clause of the First Amendment, as well as under the negative implications of the Establishment Clause. It is not to be gainsaid that slum-area parochial *661 schools do have financial troubles. The issue is whether it is constitutional for the State to maintain them. Of the estimated 280 schools in the low income areas, which the Legislature seeks to help, all or practically all, it was conceded upon the argument, are related to the Roman Catholic Church and teach Catholic religious doctrine to some degree. It is at this point that we must pause to review the history of the Establishment Clause in the courts in the light of the respective contentions of the parties.
The First Amendment of the United States Constitution made applicable to the states by the Fourteenth Amendment (Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)), provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ."
In Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, the Supreme Court was for the first time required to determine what was "an establishment of religion" in the First Amendment's conception (see id. at 29, 67 S.Ct. 504). It was there recognized by all the Justices that not simply an established church, but any law respecting an establishment of religion is forbidden and that schools teaching religion come within the scope of the clause prohibiting the "establishment of religion."[7] The precise issue in that case, upon which the Court divided five to four, was the constitutionality of a New Jersey statute which allowed reimbursement of parents for the bus fares of children attending parochial schools as well as public schools; the particular provision was held constitutional. In view of the broad meaning attributed to the Establishment Clause by all the Justices, it is instructive to consider the limitations set upon their own decision by a majority of the Court. In the words of Mr. Justice Black for the majority, the "establishment of religion" clause "means at least this: . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." Id. at 15-16, 67 S.Ct. at 511. Nor is the prohibition only against a tax levy to support religious teaching. It is also against using tax-raised funds for that purpose. Mr. Justice Black wrote: "New Jersey cannot consistently with the `establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church" (emphasis added).
The majority of the Supreme Court did conclude, nevertheless, that the reimbursement of bus fares to parents was public welfare legislation, and that New Jersey could not be prohibited from extending its general state law benefits to all its citizens without regard to their religious beliefs. But the Court was careful to note in support of its decision that "[t]he State contributes no money to the schools. It does not support them." 330 U.S. at 18, 67 S.Ct. at 513.
The general language, however, did not remove the delicacy or the difficulty of the issues raised in succeeding cases. For we are a nation which recognizes value in religion but seeks to maintain neutrality in that sphere. Neutrality is not merely a state of mind, however. Neutrality inevitably means a relationship to religion, one way or another. And thus the Court formulated a two-fold test for sustaining legislation alleged to violate the Establishment Clause: There must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. School District v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 *662 (1963). The Court recognized that this test "is not easy to apply," but that a law which "merely makes available to all children the benefits of a general [New York State] program to lend school books free of charge" is not in violation of the Establishment Clause. Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968). This decision brought forth three dissents, as well as a concurrence by Mr. Justice Harlan on the limited ground that the statute there involved "does not employ religion as its standard for action or inaction." Id. at 250, 88 S.Ct. at 1930.
The bifurcated test of intent and effect was again accepted in Walz v. Tax Commission, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), a case to which we shall advert later. Furthermore, to the two tests was added a third, that the statute must not involve an "excessive entanglement" with religion. Id.
Yet, the issue of direct financial grant to parochial schools had not yet confronted the Court. Last year, such an issue was finally presented in the case of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). This case is not only the most recent, but the most closely in point to the question of direct grants to primary and secondary parochial schools under Section 1 of the statute before us, as is Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790, decided the same day.
The Lemon case involved legislative grants as supplements to teachers' salaries in parochial schools in Pennsylvania and Rhode Island. The Rhode Island statute contained a legislative finding that the quality of education available in nonpublic elementary schools was jeopardized by the rising salaries needed to attract teachers, and authorized state officials to supplement the salaries of teachers of secular subjects in those schools by direct limited payment to the teacher, who was to teach only subjects taught in the public schools and no courses in religion. The Pennsylvania statute contained a legislative finding of rapidly rising costs in the State's nonpublic schools, and authorized reimbursement by the State to nonpublic schools of actual expenses for teachers' salaries, text books and instructional materials only in teaching secular subjects, and expressly excluded religious teaching.
Each statute, it will be seen, makes a distinction between that function of the parochial school which teaches secular subjects and that function which teaches religion, and stresses that state aid is not to be given for religious teaching. However, both the Pennsylvania and the Rhode Island statutes were struck down by the Supreme Court as violative of the Establishment Clause.
The opinion by the Chief Justice chose to hold the state legislation in violation of the Establishment Clause on the third of the three testsexcessive entanglement. This excessive entanglement was found to be of two kindsadministrative and political. The latter was based upon the prediction that continuing financial pressures on the nonpublic schools would, because of the annual nature of appropriations, generate considerable and recurring political activity to increase state aid, and that such activity would be along religious lines.
This choice of tests avoided the necessity to decide whether in all cases direct aid would be unconstitutional. But there is no indication, in our view, that the primary effect test, as a separate test, has been abandoned. And so far as precedent is concerned, the only direct aid to church-related institutions thus far sustained by the Supreme Court has been aid to hospitals, Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899) and the colleges in Tilton, where religious indoctrination was not a substantial purpose or activity of the church-related institutions. Nor was there any overruling in Lemon of various statements of the Justices that direct subsidy which aids schools with a religious mission would be unconstitutional. The striking down in Tilton of *663 the provision inferentially permitting use of the buildings after twenty years for religious purposes, on the contrary, appears to bring such a subsidy within the primary effect test, without regard to the excessive entanglement test. Tilton is discussed more fully below.
While the opinions of the Justices who wrote separately supporting the result in Lemon differ in reasoning, the quintessence of what was held may, perhaps, be gleaned from the sole dissenting opinion, that of Mr. Justice White. 403 U.S. at 662, 91 S.Ct. at 2135. He stated the issue in the following terms: "Both the United States and the States urge that if parents choose to have their children receive instruction in the required secular subjects in a school where religion is also taught and a religious atmosphere may prevail, part or all of the cost of such secular instruction may be paid for by governmental grants to the religious institution conducting the school and seeking the grant. Those who challenge this position would bar official contributions to secular education where the family prefers the parochial to both the public and nonsectarian private school. The issue is fairly joined." Mr. Justice White relied strongly on the Free Exercise Clause to support his dissent, a view also urged upon us. But the rest of the Court refused to consider the conceded constitutional right of a parent to send his child to a parochial school as sufficient to sustain the public subsidy by the States in the face of the Establishment Clause. And Mr. Justice White himself made it clear that his dissent in the Rhode Island case was based upon findings of the District Court, which he maintained were ignored by the majority; and in the Pennsylvania case, he dissented only from the holding that the statute was facially unconstitutional.
It is important, because of the varied reasoning of the majority, to note what Mr. Justice White, as well, considered to be unconstitutional, and then to compare that formulation with the issue before us. Mr. Justice White explained:
"As a postscript I should note that both the federal and state cases are decided on specified Establishment Clause considerations, without reaching the questions that would be presented if the evidence in any of these cases showed that any of the involved schools restricted entry on racial or religious grounds or required all students gaining admission to receive instruction in the tenets of a particular faith. For myself, if such proof were made, the legislation would to that extent be unconstitutional." 403 U.S. 671 n. 2, 91 S.Ct. 2140.
In the case at bar, we are dealing largely with the same parochial school system that was before this Court in Committee for Public Education and Religious Liberty v. Levitt and Nyquist, 342 F.Supp. 439 (S.D.N.Y.1972). The answers to interrogatories made there established that New York State construed as permissible beneficiaries schools which (a) impose religious restrictions on admissions; (b) require attendance of pupils at religious activities; (c) require obedience by students to the doctrines and dogmas of a particular faith; (d) require pupils to attend instruction in the theology or doctrine of a particular faith; (e) are an integral part of the religious mission of the church sponsoring it; (f) have as a substantial purpose the inculcation of religious values; (g) impose religious restrictions on faculty appointments; and (h) impose religious restrictions on what or how the faculty may teach. (Answer to Interrogatory 7) There seems to be no dispute that the statute here is also intended to apply to such schools.[8]
In Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 *664 (1971), the Court held, five to four, that payments could be made under the Higher Education Facilities Act of 1963 to certain church-related colleges under one-time Federal construction grants for college facilities excluding "any facility used or to be used for sectarian instruction or as a place for religious worship, or . . . primarily in connection with any part of the program of a school or department of divinity." (emphasis added). The Act permitted the Government to recover the funds granted within twenty years if the restrictions on use of the building for religious teaching were not met. While sustaining the payments, the Court held unanimously that limiting the right of the Government to recapture the payment if the building should be used for religious purposes after twenty years was unconstitutional. It was accepted that the use of public funds for the construction of a building to be used for the teaching of religion was facially unconstitutional. Again, Mr. Justice White, while suggesting that the Court in Tilton was ruling that payments made directly to a religious institution are, without more, not forbidden by the First Amendment, 403 U.S. at 664, 91 S.Ct. 2091, nevertheless concurred in the Court's invocation of the provision whereby the restriction on the use for religious purposes of buildings constructed with Federal funds terminates after twenty years, 403 U.S. 665 n. 1, 91 S.Ct. 2091. The line drawn, it seems to us, is that while an entirely separate building of a church-related college, in no way related to the teaching of religion or the housing of worship, may receive public funds, it may not receive such funds from the moment when secular and religious teaching or prayer are mixed in the same building.
Moreover, a direct grant to the parochial school is not the same as an across-the-board payment to parents of parochial school children which advances the common good as distinguished from religious good, and which equalizes the burden of the nonpublic school parent. The majority by Mr. Justice White in Allen, supra, pointed out the distinction: "Thus, no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools." 392 U.S. at 243-244, 88 S.Ct. at 1926. Mr. Chief Justice Burger, in Lemon, noted that "the Pennsylvania statute, moreover, has the further defect of providing state financial aid directly to the church-related schools." 403 U.S. at 621, 91 S.Ct. at 2115. He distinguished Everson and Allen on the very ground that there state aid was provided to the student and his parents not to the church related school. And he noted that in Walz the Court had warned of the dangers of direct payments to religious organizations. Id.[9]
*665 In Mr. Justice Brennan's view, "[g]eneral subsidies of religious activities would, of course, constitute impermissible state involvement with religion." Walz v. Tax Commission, supra, 397 U. S. at 690, 90 S.Ct. at 1422.
This view is supported by history. The New York State Constitution provides in Article XI, § 3:
"Neither the state nor any subdivision thereof shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning."
Fewer than a half-dozen states omit such a provision. See 403 U.S. 647 & n. 6, 91 S.Ct. 2105. While the ultimate decision in the Tilton case prohibited a grant for construction of a building used for religious teaching (even after twenty years), the Constitution of New York itself prohibits the granting of such funds for "maintenance," the very objective of Section 1 of the statute we are considering. While it is not our purpose to determine constitutionality under the New York Constitutiona matter reserved for the State courts we cannot avoid being impressed, in our consideration of the guidelines of the Supreme Court, by the almost unanimous views of the states as expressed in their respective constitutions adopted by the people.
The argument is made, however, that since janitorial functions and snow removal obviously are not the teaching of religion, their neutral character permits a benevolent grant for these purposes from the tax raised funds in the State Treasury. The argument is bottomed on the assumption that a parochial school budget is divisible. It rejects the argument that once a public subsidy is given it lightens the burden on the rest of the budget and even permits more of the other private money to be used for religious instruction. Not having to pay the janitor makes it reasonable to assume that the money otherwise going to him can be used to increase the salary of a religious teacher or the fund for the purchase of objects of religious devotion. If it be argued that the subsidy would go only to the needy parochial school which has no surplus to apportion, the short answer is, of course, that such a parochial school would have more than it has now, for it does now pay from its present budget for janitor services and heat.[10]
The vice, moreover, is not only that the school budget as such is indivisible, but that no effort is made in this part of the statute to distinguish between secular and religious education. The janitorial service embraces cleaning the chapel, where there is one, and heat *666 is provided to the classrooms where religion is taught. There is no suggestion that heat is to be cut off while prayer or religious teaching is conducted in the same schoolroom. Cf. Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 211, 68 S.Ct. 461, 92 L.Ed. 649 (1948).[11]
Nor is the aid provided, though neutral in the sense of direct religious activity, given to any but a small class of institutions, almost all Roman Catholic, in deprived areas. It provides direct support for the maintenance of schools which teach religion.
Moreover, as Chief Justice Burger said in Walz, supra, "Obviously a direct money subsidy would be a relationship pregnant with involvement," 397 U.S. at 675, 90 S.Ct. at 1414. The "involvement" includes the inevitable auditing of reports of expenditures for maintenance and repair which surely must include the right of the State to determine the fairness of the charges made. The determination must be made whether the expenditures were, in fact, commensurate with the amount of the grant under the formula.
And the very percentage formula ($30 or $40 per pupil out of the entire tuition) honestly intended to avoid use of the subsidy for religious purposes, inevitably requires an assessment of how much of the education supplied is secular and how much religious. It is argued that the Legislature was careful to allow only fifty per cent of the actual costs of "maintenance and repair," as a maximum, and that this is assurance that the maintenance grant is not for religious teaching. But the very argument invites considerations of the percentage relationship of secular to religious teaching and the relative impact of religious indoctrination. The Tilton approach is not possible where the school to be benefited is not merely church-related but is itself part of the religious mission. If the Legislature is to be asked to determine formulas based on religious teaching vel non, it invites the very excessive entanglement we were instructed to avoid in the Lemon case.
If public subsidy for janitorial service and heat to needy nonpublic schools is allowed, we may ask whether the next step will not be to supply desks and blackboards and ultimately part of a building on a percentage basis, on the ground that these are not religious in character. Would it not then be argued that where a building is in serious disrepair it is better not to patch it up but to build a new building with public funds on the ground that such would be a health and welfare grant?
Nor is the argument based on the police power of the State convincing. Education is as much an important function within the police power of a State as are health and safety. See Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1934). The conflict of the First Amendment with the police power has been made apparent in the constitutional decisions affecting educational activity by the states. Almost any legitimate activity, except the teaching or preaching of religion itself, can be said to be within some element of police power of the State. Yet, a State law enacted in the exercise of otherwise undoubted State power may not prevail against Federal law. See Sears, Roebuck & So. v. Stiffel Co., 376 U.S. 225, *667 229, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). State power, as we have been instructed, cannot, in this area, leap the constitutional barrier when it uses direct, special subsidy as the means to implement such power.
The political pressures on the Legislature are bound to be strong along religious lines. As the Chief Justice said in Lemon: "The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow." 403 U.S. at 623, 91 S.Ct. at 2116.[12]
To summarize our reluctant conclusion that we cannot sustain a direct public subsidy for the "maintenance and repair" of religious schools under the guidelines of the Supreme Court, our points of departure with the argument of the State of New York are that: (1) "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." Everson, supra, 330 U.S. at 16, 67 S.Ct. at 511 (emphasis added). We think Tilton does not overrule the application of the dictum to the case at bar. (2) The statute involved, though concentrating on schools in deprived areas, makes no distinction between secular and religious teaching, and tax-raised funds are directly used for the maintenance of buildings which teach religion. (3) We cannot accept the view that, under present doctrine, budgets for churches, synagogues or parochial schools can be made divisible by ascribing a percentage of cost to neutral functions. (4) On the contrary, we interpret the dictum of the Supreme Court that neutral services may be afforded to parochial schools to mean simply that general services, such as transportation, secular books, free lunches and, perhaps, athletic training, visiting nurses and the like, afforded to students in all schools may also be made available to students in parochial schools. (5) We think that, unlike the one-time construction of new buildings as in Tilton, the "maintenance and repair" provisions of the New York statute involve "continuing financial" and political "relationships [and] dependencies." Tilton, supra, 403 U.S. at 688, 91 S.Ct. 2091.[13]
In sum, we hold that, although we accept the intention of the legislation as being essentially secular and within the police power of the State, the effect of Section 1 of the statute in its present form is inevitably to advance religion. We hold, alternatively, that that Section creates a potentially excessive entanglement of the State with religion with potentially undesirable consequences to both.

II
Section 2 of the statute provides for partial reimbursement to needy parents for the tuition they pay to send their children to parochial schools. Although the payment is to the parent, by hypothesis he is within a low annual income bracket (below $5,000) which would make it possible that he could not afford to send his children to parochial school in the absence of a direct subsidy *668 from the State Treasury. Indeed, it is the very assumption of the Legislature in its findings that he will use the money grant for tuition. Whether he gets it during the current year, or as reimbursement for the past year, is of no constitutional importance. The recipient is the parochial school. The source is the State tax-derived money. The parent is simply a conduit. See Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Griffin v. State Board of Education, 239 F.Supp. 560, 563 (E.D.Va.1965), overruled on other grounds, 296 F.Supp. 1178 (E.D.Va.1969); Wolman v. Essex, 342 F.Supp. 399 (E.D.Ohio 1972).
While in the general distribution of a State aid program, as in the case of reimbursement of bus transportation to parents (Everson, supra), the loan of text books to students (Allen, supra), free lunches to children and the like, there is a distinction between a grant to the family and a grant to the parochial school, there is no such distinction where the parent is a mere conduit for a payment of tuition. In the former, the costs assumed by the State were generally borne by the parents, in the first instance, and it is they who are being reimbursed, not the school. In the case of tuition, it is the school which benefits by getting tuitions from State funds which it might otherwise not receive.[14]
The essential reliance of the State in support of this part of the statute is twofold: (1) that the free exercise of religion is inhibited if the needy may not be subsidized with State funds to aid their "right" to a parochial school education for their children; and (2) that the State will gain economic benefit from supporting parochial schools, because otherwise the fiscal burden cast upon the State in the event of their unfortunate demise will be almost intolerable.
These are serious arguments that cannot be disregarded, particularly when made by a State Legislature, and we have given considerable thought to their meaning and implications, particularly in the light of our sympathy for the argument that in a pluralistic society it is a positive good to have a variety of educational institutions, not all public. As we have delved into the implications of these arguments we have become convinced, however, that, under our oath to defend the Constitution, we must hold that they fail.
The argument based on the Free Exercise Clause has a superficial appeal. Why should a richer man have the right to practice his religion as he sees fit while a poor man cannot do so only because of his poor financial condition? Are we not a nation that abhors distinctions based on wealth, and have we not strained the fisc to equalize the condition of rich and poor before the law? Indeed, we have left partisanship behind in our common belief that equality, so far as it is possible to achieve, is a desirable goal for our society.
The propagation of religious doctrine was early made the responsibility of the particular denomination in hard times as *669 well as good times. We know, however, that inflation was no concern of the framers of the First Amendment, and, as individuals, we sympathize with its victims. But a State-supported church school is simply not a part of our way of life, and the payment of tuition for its pupils makes the church school a State-supported school.[15]
While there can be no proof either way, it is possible that among persons eligible for the tuition grant there will be not only those who now have their children in a parochial school but also some whose children now attend the public schools and whom they would transfer to a parochial school.
The implications of recognizing a "right" to the support of public funds for the expression of the free exercise of religion are, moreover, staggering. Religious belief and the right to practice religion, including the teaching of the young, are precious rights to be preserved unto death itself. But a subsidy to those who practice a particular religion to enable them to observe its tenets is not compatible with either clause of the First Amendment. If State subsidy may be given for religious education, why may it not be given to the poor for the purchase of sacramental wine, or a crucifix or a Torah, a printing press for Jehovah's Witnesses, or for a trip to a Baptist convention or to hear a favorite evangelist, or for a Muslim to take his pilgrimage to Mecca. These are all "rights" to the free exercise of religion that cannot be denied, and from the exercise of which the poor may be excluded by circumstance.
If the Founding Fathers had any intentions about religion, it was surely to separate the concern of the Government from the concern of the individual religious community. That is why we have the double-edged religion clauses of the First Amendmentno law respecting the establishment of religion or the free exercise thereof. Each sector must not only respect its own proper functions. Each must also support them. This appears to be the essence of the voluntarism requirement of the First Amendment; see Harlan, J., concurring in Walz, supra, 397 U.S. at 696, 90 S.Ct. 1409.
The examples cited by the State to support its argument for tuition reimbursement to poor parents deal with the striking down of exactions by the State of money from the poor as a condition to their exercise of particular constitutional rights, like the right to sue in the courts for divorce without paying court costs, Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), and the right to vote without paying a poll tax, Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). So, too, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) held invalid the denial of unemployment benefits where the free exercise of religion was inhibited. The statute here, on the contrary, affirmatively establishes benefits for the free exercise of religion. No case has been cited where an affirmative cash subsidy to advance the constitutional right to the free exercise of religion was allowed.
Nor do we ignore the argument forcefully put by the State and by representatives of the able majority leader of the State Senate. The possible closing of Catholic parochial schools on a large scale would cast a heavy burden on an already overburdened State. But we must recognize, within the guidelines set by the Supreme Court, that economic hardship alone is not enough to overcome the strictures of the First Amendment. The Court in Lemon, supra, accepted the legislative findings of economic stringency in the parochial schools, *670 with the obvious, if not fully articulated, potential effect on the State finances of Rhode Island and Pennsylvania. It, nevertheless, struck down what were clearly economic measures to help the fiscal condition of the nonpublic schools with the possible consequence of forced absorption of their burdens by the States.
The argument, like many good arguments, stretches the band to the breaking point. For it must be tested for validity against contingencies which could occur and which would have a strong effect on legislative action, not only because of religious pressures on the legislators, but because of the conviction that the public treasury has more to gain by supporting church schools directly than by not supporting them.
If conditions worsen, it would be proper, under this argument, to pay the salaries of the secular teachers. But that is what has just been invalidated by the Supreme Court. The argument would logically admit of circumstances, honestly based upon economic need, which would support the grant of public funds, at least for secular education, in geographic areas where there were not enough parochial schools, and where the pressure of population would otherwise cause great hardship to the neighborhood public schools. Once we embark upon such a course, we fear that the meaning of the Establishment Clause will be diluted to the point where the State will support the parochial schools with the inevitable control by the State built into an anomalous situation. That is a condition devoutly not to be wished. The proponents of this legislation will probably affirm that they are willing to take their chances on such an eventuality and that they would rather have the funds in hand. But it is the peculiar function of the judicial branch to remain unmoved by current desires, not in the sense of usurping the province of legislatures, but in viewing basic constitutional provisions as outliving the generation of men which has to interpret them.[16]

III
The third part of the statute, the tax credit for tuition paid by parents to nonpublic schools, we think stands in different case. In the first place, it is not restricted to areas which by concession are known to contain practically only Catholic parochial schools as in Part I. It covers attendance at all nonprofit private schools in the State. Second, it does not involve a subsidy or grant of money from the State Treasury as in Parts I and II. Third, it has a particular secular intentone of equity to give some recompense by way of tax relief to our citizens who bear their share of the burden of maintaining the public schools and who, because of religious *671 belief or otherwise, send their children to nonpublic full-time schools, as is their constitutional right. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Fourth, the benefit to the parochial schools, if any, is so remote as not to involve impermissible financial aid to church schools. Lastly, there is a minimum of administrative entanglement with the nonpublic schools. Nor is the ongoing political activity as likely, in our opinion, to cause division on strictly religious lines.
We shall explain our reasons briefly.
There has always been a sharp distinction in the history of the United States between direct grants of public funds to religious institutions, generally prohibited, and tax exemption for religious institutions, generally permitted. This indirect aid to religious institutions has largely taken two forms, exemption from local property taxes and the like, and income tax exemptions for contributions to religious institutions. The former method was lately before the Supreme Court in Walz, supra. The latter method has never been challenged in the Supreme Court. As the Court noted in Walz, the real property tax exemption provision for churches is two hundred years old. The acquiescence in the practice by the people, the historical absence of religious divisiveness, and the exemption's ancient origin were considered to lend support to its exclusion from the restraints of the religion clauses of the First Amendment.
In Walz, the Court recognized that "[g]ranting tax exemptions to churches necessarily operates to afford an indirect economic benefit, . . ." 397 U.S. at 674, 90 S.Ct. at 1414; yet the New York statute granting to churches as well as other educational and civic institutions exemption from real property taxes was sustained. The Court also noted in Walz that "[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." Id. at 675, 90 S.Ct. at 1415.
It certainly can be argued that if the power to tax is the power to destroy, the power not to tax is the power to support. The Supreme Court has not accepted that view, and has rejected the argument that exemptions do not differ from subsidies as a matter of economics.
Our distinguished colleague, Judge Hays, in his dissenting opinion assumes constitutional invalidity because the "purpose and effect of this provision of the statute [Part III] are . . . to subsidize religious training for children." Why, then, it may be asked, does not an income tax deduction for a contribution to a church "subsidize" religious worship for parents? If, indeed, "there is no essential difference between a parent's receiving a $50 reimbursement for tuition paid to a parochial school and his receiving a $50 benefit because he sends his child to a parochial school," then there should be no essential difference between a parent's receiving a $50 "reimbursement" for a payment to his parish church and his receiving a $50 "benefit" for the same payment. As Judge Hays states it, "in both instances the money involved represents a charge made upon the state for the purpose of religious education." With great respect, we paraphrase this to say that, in our illustration as well, it could be said that the money involved represents a charge made upon the State for the purpose of denominational worship. Yet we have abided this very condition in our taxing system for many years, although we know that some denominations conduct church-related Sunday Schools or even weekday afternoon classes in religion.
Whether the distinction is based on logic, history or simply on an authoritative guideline set by the Supreme Court, we may approach our difficult task with the distinction between subsidy and tax exemption in mind. It cannot be a perfect guide, for the statute involved in Walz gave real property tax exemption to a great many institutions, not only *672 churches, there was no question of arbitrary classification, and alleged State involvement with religion was at least equivocal. On the other hand, in favor of its validity is the circumstance that under Section 3 of our statute, the income tax exemption (which is in effect a tax credit since the exemption is not intended to equal the parents' outlay) is to individuals, not to churches or church schools, a step removed. This kind of income tax relief, while not as old as property tax exemption because the constitutional income tax law itself is relatively modern, has been on the Federal statute books for more than half a century. It has been a consistent legislative policy ever since the 1917 Revenue Act for the Congress to permit the deduction of so-called charitable contributions from personal income.[17] This has always included direct gifts to churches. The purpose is no doubt to encourage such contributions. 5 J. Mertens, Law of Federal Income Taxation § 31.01 (1969); Bliss v. Commissioner, 68 F.2d 890 (2 Cir. 1934), aff'd, Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246 (1934).
We think that, aside from the "equal protection" problem which we do not pass upon, the credit against gross income of a fixed amount if tuition is paid to nonpublic schools does not sponsor or render forbidden financial support to church schools, at least in the limited form in which relief is given here. Credit is allowed not only to parents who pay tuition to a religious school but also to any nonprofit, nonpublic secular school. The table in the statute is geared roughly to the tax brackets and the rate of tax imposed on each bracket. The result ranges from a small, almost token, forgiveness to a family which attains an adjusted gross income of almost $25,000 to a forgiveness roughly approximating the tuition cost of $50 per child for a family in the lowest bracket. A memorandum prepared by Senator Brydges indicates that a family with three children in a nonpublic school would get a net benefit annually ranging from $150 if the family has an adjusted gross income of less than $9,000, to $36 if the family has an adjusted gross income of $24,999. The benefit is inverse to income. And we believe the Legislature has power to decide between allowing deductions and allowing credits.[18]
It seems to us unlikely, at least in the absence of strong proof, that a person having $6,000 to $9,000 per annum as an adjusted gross income would take his forgiveness or windfall and hand it back to the parochial school as additional tuition. He would, more likely, compensate himself for the tuition paid in an amount which would otherwise have gone to the State for income taxes. Thus, it is likely that while the State loses revenue, as it does generally in allowing charitable deductions, it does not aid the parochial school, as it may, indeed, do when it allows deductions for direct contributions to the church. If, in fact, persons in a somewhat higher bracket should forgo the forgiveness and turn over the tax saving to the church, that would be a voluntary act not different in kind from an ordinary church contribution. Indeed, it is to be hoped that at least part of the costs of educating poor children will come from this source.
Once we have hurdled the constitutional barrier to income tax benefit for contributions directly made to churches, as we believe we must, there is not much further to travel. It is true that the argument may be advanced, as the dissenting opinion does, that the parent receives a consideration in the education *673 of his child, while there is no quid pro quo in a contribution to a church. And we understand that the Federal tax authorities do scrutinize contributions of parochial school parents with that yardstick. See Fausner v. Commissioner, 55 T.C. 620 (1971).
We are not dealing, however, with the interpretation of a revenue act but with an inquiry upon the limitations of the power of a State Legislature under the Federal Constitution. As a Court, we may not pass on questions of religious values or even adumbrate the moral or religious "consideration" that may accrue to the donor of a gift to the church of his choice.
We put it more simply in practical terms. If a parishioner made a contribution to his parish, and the parish school were entirely free of tuition, would he be denied his income tax deduction because his child attended that school? Opinions may differ on the interpretation of present statutes, but it seems to us likely that an affirmative formulation by the Legislature would be constitutional.
We have not been asked to pass upon the constitutionality of part three on "equal protection" grounds, and we do not do so, cf. Everson, supra, 330 U.S. at 4-5, 67 S.Ct. 504.[19] Putting such argument to one side, we think that the pressure on legislators to amend the income tax law is likely to be more from nonpublic school parents as a group rather than from parents of a single religious denomination. The principles of equity rather than of religious aid will probably be put to the fore if further liberalization by the Legislature is sought. And that we believe would not make for an inevitable excessive entanglement with religion in the legislative halls. As to administrative entanglement under part three of the statute, we see none beyond checking with the school simply to determine whether the tuition claimed to have been paid was actually paid.
We note, moreover, that the secular purpose as well as its effect is strong. The lightening of the tax burden of those who contribute to public education while deriving no benefit from it for themselves, albeit theirs is a voluntary choice, is a legitimate legislative purpose. In effect, it is no different from giving some exemption from school tax to childless couples or the aged, who no longer have children of school age. The Legislature certainly has a broad power to classify in a tax statute. 1 J. Mertens, supra, § 4.09. As we have said, however, we do not now deal with the "equal protection" argument, the reasonableness of the classification by those standards, or whether there is an appropriate governmental interest suitably furthered by the different treatment. See Police Department of City of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).
We hold only that Section 3 of the statute is not in conflict with the First Amendment Establishment Clause, as applied to the states through the Fourteenth Amendment.
We also find Section 3 of the statute separable from the parts found to be unconstitutional. The statute itself contains a separability clause (§ 11). And we are not required to invalidate the entire Act. See Tilton, supra, 403 U.S. at 683-684, 91 S.Ct. 2091; Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).
A permanent injunction will be issued against the enforcement of Sections 1 and 2 of the statute. Judgment will be entered accordingly, pursuant to Fed.R. Civ.P. 54(b). The Court expressly determines that there is no just reason for delay. A permanent injunction against enforcement of Section 3 of the statute will be denied. The complaint so far as *674 it relates to Section 3 of the statute, will not be dismissed, however. The parties may move for summary judgment or for an expedited trial.
An order will be settled on notice.
The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).
HAYS, Circuit Judge (in part concurring in the result, dissenting in part).
I am in agreement with the view of my colleagues that the part of the state statute (N.Y.Laws of 1972, c. 414) providing for grants to private schools for the maintenance of buildings cannot survive a challenge based on the Establishment Clause and the cases decided under it. Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Bd. of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Everson v. Bd. of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). I agree with Judge Gurfein's view that the part of the statute providing for flat tuition grants to low-income parents is also unconstitutional. In addition to the cases previously cited see also Wolman v. Essex, 342 F.Supp. 399 (E.D.Ohio, 1972) (three judge court); Lemon v. Sloan, 340 F.Supp. 1356 (E.D. Pa., 1972) (three judge court). I therefore concur in the result reached by Judge Gurfein as to these aspects of the statute.
I dissent from the court's judgment concerning section 3 of the state act. I believe that that section, which provides for tax benefits with respect to tuition paid by the taxpayer for children attending religious schools, is also unconstitutional.
The purpose and effect of this provision of the statute are the same as the second portion, i. e., to subsidize religious training for children.[1] Both sections aim to reimburse parents who have chosen to send their children to religious schools. As Mr. Justice Jackson said:
"The prohibition against establishment of religion cannot be circumvented by a subsidy, bonus, or reimbursement of expense to individuals for receiving religious instruction and indoctrination." Everson v. Bd. of Education, 330 U.S. at 24, 67 S.Ct. at 516 (Jackson, J. dissenting).
And "[w]hat may not be done directly may not be done indirectly lest the Establishment Clause become a mockery." School District of Abington v. Schempp, 374 U.S. 203, 230, 83 S.Ct. 1560, 1575, 10 L.Ed.2d 844 (Douglas, J. concurring).[2]
*675 The benefits of the tax exemption allowed by section 3 are of the same nature as those accorded under the tuition reimbursement provisions of section 2. There is no essential difference between a parent's receiving a $50 reimbursement for tuition paid to a parochial school and his receiving a $50 benefit because he sends his child to a parochial school. In both instances the money involved represents a charge made upon the state for the purpose of religious education.
The exemption of church property from ordinary taxation provides no analogy for the tax benefits of the present statute. The schools in the nonprofit nonpublic category in New York State are tax-exempt, N.Y. Real Prop. Tax Law § 421(1)(a) (McKinney Supp.1971), and that status is not in dispute in this case. In Walz v. Tax Commission, supra, the Court believed nearly two centuries of acquiescence in and approval of such exemptions lent support to the proposition that the exemptions did not violate the Establishment Clause. 397 U.S. at 680, 90 S.Ct. 1409. Moreover, the Court noted in Walz that the State had not "singled out one particular church or religious group or even churches as such; rather it [had] granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations . . . ." Id. at 673, 90 S.Ct. at 1413. Here, as the three judge panel pointed out in Wolman v. Essex, supra, "[t]he limited nature of the class affected by the legislation, and the fact that one religious group so predominates within the class, makes suspect the constitutional validity of the statute." 342 F.Supp. at 412. Finally, the Walz court held (p. 674, 90 S.Ct. p. 1414) that:
"Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes."
The Walz decision, as the Court said in Lemon v. Kurtzman, supra, p. 614, 91 S.Ct. p. 2112 "tended to confine rather than enlarge the area of permissible state involvement with religious institutions . . . ."
Nor does the present case concern the tax deductibility of religious contributions. Such contributions, even to church schools, are deductible under New York law, N.Y. Tax Law § 360(10)(b) (McKinney 1966), and they would not be affected by the statute under scrutiny. Even assuming that tax deductions for contributions to religious schools are constitutionala point not yet passed upon by the Supreme Courtwe are not dealing with such deductions in the present case. A payment for services rendered is not a contribution, and such payments are not deductible. As the court said in DeJong v. Commissioner, 36 T.C. 896, 899-900 (1961), aff'd 309 F.2d 373 (9th Cir. 1962):
"We are satisfied on the record before us that at least a portion of the $1,075 paid by petitioners to the society was in the nature of tuition fees for the education which the society was expected to furnish to petitioners' children and was not in fact a true charitable contribution. Payments pledged and made by parents in the circumstances disclosed by the evidence were not voluntary and gratuitous contributions motivated merely by the satisfaction which flows from the performance of a generous act; they were induced, at least in substantial part, by the benefits which the parents sought and anticipated from the enrollment of their children as students in the society's school." *676 See also McLaughlin v. Commissioner, 51 T.C. 233 (1968); Fausner v. Commissioner, 55 T.C. 620 (1971).
The tax benefit statute was quite frankly enacted as a substitute for partial subsidies to parents who pay tuition to religious schools. It goes hand in hand with section 2. The benefits for section 3 parents begin at approximately the point where the grants to section 2 parents leave off.[3]
As a matter of fact section 3 is so closely bound up with section 2 that the invalidity of section 3 follows from its relationship to section 2. If it is evident that the legislature would not have enacted the part of the statute that is claimed to be within its power independently of that which is not, the statute is wholly invalid, regardless of the inclusion of a separability clause. Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932). It is obvious that the New York state legislature would not have enacted section 3 benefiting the wealthier parents had they not intended it to be a complement to section 2 benefiting low income parents. Section 3 must therefore fall if section 2 is unconstitutional, as we have held it is.
For the foregoing reasons, I respectfully dissent from the determination of the court as to the constitutionality of section 3.
NOTES
[1] Parents of children enrolled in nonpublic schools have been permitted to intervene as parties defendant. Similar permission was granted to Hon. Earl W. Brydges, Majority Leader and President pro tempore of the New York State Senate.
[2] The sections of the Act not under attack provide for impacted aid to public schools which have increased enrollment due to the closing of nonpublic schools, and provide for the purchase of nonpublic school buildings by public school districts where the nonpublic school has been closed (sections 6-10).
[3] 20 U.S.C. § 425 deals with the partial forgiveness by the Federal Government of certain educational loans to students who become teachers in "a school in which there is a high concentration of students from low-income families," and provides a method for determining that criterion.
[4] The amount of the grants is limited to "fifty per centum of the average per pupil cost of equivalent maintenance and repair in the public schools of the state on a state-wide basis, as determined by the commissioner."
[5] Because of the suggestion that it was essential for the State to know promptly whether it could disburse the funds as provided in Section 1, we announced in a per curiam opinion our holding that this Section was in violation of the First Amendment as applied to the states by the Fourteenth Amendment. This opinion elaborates that decision.
[6] The table is as follows:

If New York adjusted The amount allowable
gross income is: for each dependent is:
Less than $9,000 $1,000
 9,000-10,999 850
11,000-12,999 700
13,000-14,999 550
15,000-16,999 400
17,000-18,999 250
19,000-20,999 150
21,000-22,999 125
23,000-24,999 100
25,000 and over -0-
 Estimated Net Benefit to Family
One Child Two Children Three or more
$50.00 $100.00 $150.00
 42.50 85.00 127.50
 42.00 84.00 126.00
 38.50 77.00 115.50
 32.00 64.00 96.00
 22.50 45.00 67.50
 15.00 30.00 45.00
 13.75 27.50 41.25
 12.00 24.00 36.00
 -0- -0- -0-

[7] Id. at 15, 67 S.Ct. 504 (Black, J.), see Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 211, 68 S.Ct. 461, 92 L.Ed. 649 (1948).
[8] The plurality opinion in Tilton, infra, by the Chief Justice makes it clear that the plurality was convinced that, with respect to the four colleges there involved, "religious indoctrination is not a substantial purpose or activity of these church-related colleges and universities." 403 U.S. at 687, 91 S.Ct. at 2100. On the other hand, aid to primary and secondary parochial schools is supported in New York on the very ground that parents have the right to choose parochial school education for their children as an important incident to their free exercise of religion, which includes the right to provide for religious indoctrination of the children through the parochial school.
[9] The impact of Lemon and Tilton on direct cash payments is suggested by two memorandum decisions filed on the same day. The Court vacated and remanded, for consideration in the light of Lemon and Tilton, Kervick v. Clayton and Hunt v. McNair, 403 U.S. 945, 91 S.Ct. 2274, 29 L.Ed.2d 854 (1971). Kervick had upheld construction loans under the New Jersey Educational Facilities Authority Law, 56 N.J. 523, 267 A.2d 503 (1970). Hunt had upheld the issuance of bonds to pay off the indebtedness of a Baptist College under the Educational Facilities Authority Act, 255 S.C. 71, 177 S.E.2d 362 (1970).

The Supreme Court of New Jersey, after the remand, held valid the statute which creates an Educational Facilities Authority to sell bonds and lend the proceeds to educational institutions, without pledging the credit of the State. Clayton v. Kervick, 59 N.J. 583, 285 A.2d 11 (1971). But it concluded that even with respect to loans, as distinguished from grants, a facility may not be used for sectarian instruction or as a place of religious worship even after repayment of the loans; and no college may participate if it restricts entry on racial or religious grounds or requires all students gaining admission to receive instruction in the tenets of a particular faith. Id. at 20-21.
The Supreme Court of South Carolina also upheld its loan statute which provided that the facilities involved shall not be used for sectarian instruction. Hunt v. McNair, S.C., 187 S.E.2d 645, 652 (1972).
[10] The State urges upon us for consideration some language of Chief Justice Burger in Tilton, supra, to the effect that "[c]onstruction grants surely aid these institutions [the church-related colleges] in the sense that the construction of buildings will assist them to perform their various functions." 403 U.S. at 679, 91 S.Ct. at 2096. The State notes that this form of governmental assistance was upheld.

Taking it in its literal sense the argument from the language is a fair one. But the quoted language must be read in the light of the Chief Justice's actual holding that use of the buildings for religious purposes, even after twenty years, was unconstitutional.
[11] The Supreme Court of Wisconsin recently held to be in violation of the Establishment Clause of the First Amendment a statute which authorized the contracting for purchase of dental education by the University [Marquette] dental school because it permitted the use of funds paid under the contract "in support of [the] operating costs" of the university without limiting the use of such funds exclusively to the providing of dental education in the dental school of the university. State ex rel. Warren v. Nusbaum, 55 Wis.2d 316, 198 N.W.2d 650 (1972). This result was reached even though the Court recognized that the very nature of dental education assures the completely secular nature of the teaching of dentistry.
[12] The brief of Senator Brydges argues that "[i]t is beyond the authority of the courts of the United States to dictate to the sovereign legislatures of the several states the parameters of its [sic] debates" (p. 37). We think that the Supreme Court, in its emphasis on "excessive entanglement" did not intend to limit legislative debate, but rather to strike down legislation which would encourage future divisive debate on religious lines. Whether this constitutional test should be modified is not within the province of this District Court. The argument can be made only to the Supreme Court.
[13] It must be noted that the colleges involved in Tilton were not directly controlled by the church; the elementary and secondary schools covered by the New York statute are controlled by a religious hierarchy.
[14] Senator Brydges' brief argues as "history" (p. 16) that with respect to Section 3209 of the N.Y. Education Law, the New York Attorney General in 1935 ruled that it applied to children attending parochial schools as well as public schools. We agree that the affirmative duty of "public welfare officials" to furnish "indigent children with suitable clothing, shoes, books, food and other necessaries to enable them to attend upon instruction as hereinbefore required by law" does not require the denial of these benefits to needy children who attend parochial schools. But there is nothing in that statute concerning the payment by the state of tuition for needy children. The Education Law involved a general grant to all which did not include tuition.

As to tuition, there may be situations where special circumstances make attendance at public schools impractical as in the case of orphan schools, see Sargent v. Board of Education, 177 N.Y. 317, 69 N.E. 722 (1904); Indian schools, Education Law, art. 83; and schools for deaf and blind children, id. art. 85. But those sections are not relevant to normal children who can attend the public schools.
[15] In the language of Chief Judge Lord in Lemon v. Sloan, 340 F.Supp. 1356, 1364 (E.D.Pa.1972): "The state cannot maintain that the Act has the purpose of promoting education by supporting nonpublic schools and then deny that the effect of the Act is to aid these schools."
[16] (a) A similar conclusion was recently reached by a three-judge court in the Eastern District of Ohio. Wolman v. Essex, 342 F.Supp. 399 (E.D.Ohio 1972). There moneys had been appropriated for "educational grants to parents" and for the provision of neutral, non-religious "materials and services" for pupils attending nonpublic schools. The statute was held to be in violation of the Establishment Clause of the First Amendment.

(b) A Pennsylvania Act providing for reimbursement of tuition payments to parents whose children attend nonpublic schools was declared unconstitutional in spite of a legislative declaration that parents who send their children to nonpublic schools assist the State in reducing the rising cost of public education, and that if children now attending nonpublic schools were forced to transfer to public schools "an enormous added financial, educational and administrative burden would be placed upon the public schools and upon the taxpayers of the State" Lemon v. Sloan, supra 340 F.Supp. at 1366 (E.D.Pa.1972) (three-judge court). Chief Judge Lord wrote: "If parents cannot afford to provide religious education for their children in sectarian schools without state aid, then by providing a program for aiding the parents, the state is plainly advancing religious education. The state has no more power to subsidize parents in providing a religious education for their child than it has to subsidize church-related schools to do so." Id. at 1365.
[17] Revenue Act of 1917, c. 63, § 1201(2), 40 Stat. 330. That statute allowed as a deduction, "[c]ontributions . . . made . . . to corporations or associations organized and operated exclusively for religious, charitable, scientific or educational purposes."
[18] A deduction of $150 for a person in a 6% tax bracket ($7,000 to $9,000) would have given him only a nine dollar benefit.
[19] There the Court refused to consider whether the apparent exclusion of "private schools run for profit" violates the Equal Protection Clause of the Fourteenth Amendment, because the statute was not challenged on that ground.
[1] Although section 3 is made applicable to parents whose children attend any nonprofit nonpublic school, the overwhelming majority of these parents are sending their children to religious schools where sectarian indoctrination takes place. According to the Fleischman Commission report, religious schools make up 93.5% of New York State's nonpublic schools. The remaining 6.5% consist of both profit-making and nonprofit-making private schools. Report on Nonpublic Education in the State of New York for the New York State Commission on the Quality and Financing of Elementary and Secondary education, "The Collapse of Nonpublic Education: Rumor or Reality?", Vol. 1, pp. 1-6. See Transcript in Pearl v. Nyquist, p. 64. The profit-making schools are not, of course, covered by section 3.
[2] In the context of racial discrimination, grants to schools, students or their parents to avoid the commands of the Fourteenth Amendment have been consistently struck down. See Griffin v. County School Bd. of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Hall v. St. Helena Parish School Bd., 197 F.Supp. 649 (E.D.La., 1961), aff'd, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed. 2d 521 (1962); Lee v. Macon County Bd., 267 F.Supp. 458 (M.D.Ala., 1967) aff'd, sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967); Brown v. South Carolina State Bd., 296 F.Supp. 199 (D.S.C., 1968) aff'd, 393 U.S. 222, 89 S.Ct. 449, 21 L.Ed.2d 391 (1968); Coffey v. State Educ. Finance Comm'n, 296 F.Supp. 1389 (S.D.Miss., 1969).
[3] The following table shows the estimated net benefits to taxpayers under section 3. The information is taken from the memorandum which accompanied the bill. It was submitted to each legislator by Senator Brydges and was cited by the majority ante p. 672.

If Adjusted Gross Income Exclusion Estimated Net Benefit to Family
 Income is Per Pupil is One child Two children Three or more
Less than $9,000 $1,000 $50.00 $100.00 $150.00
$9,000-10,999 850 42.50 85.00 127.50
11,000-12,999 700 42.00 84.00 126.00
13,000-14,999 550 38.50 77.00 115.50
15,000-16,999 400 32.00 64.00 96.00
17,000-18,999 250 22.50 45.00 67.50
19,000-20,999 150 15.00 30.00 45.00
21,000-22,999 125 13.75 27.50 41.25
23,000-24,999 100 12.00 24.00 36.00
25,000 and over 0 0 0 0