Robert J. KOSYDAR, Tax Commissioner of Ohio et al., Plaintiffs,

v.

Benson A. WOLMAN et al., Defendants.

Benson A. WOLMAN et al., Plaintiffs,

v.

Robert J. KOSYDAR, Tax Commissioner of Ohio et al., Defendants.

Civ. A. Nos. 72–212, 72–222.

United States District Court, S. D. Ohio, E. D.

Dec. 29, 1972.

William J. Brown, Atty. Gen., David Young, Columbus, Ohio, for plaintiffs Robert J. Kosydar and others.

Leonard J. Schwartz, Columbus, Ohio, for plaintiffs Benson A. Wolman and others.

Leonard J. Schwartz, Columbus, Ohio, Joshua Kancelbaum, Cleveland, Ohio, Stanley K. Laughlin, Melvin Wulf, New York City, Philip Dunson, Columbus, Ohio, for defendants Benson A. Wolman and others.

Wm. J. Brown, Atty. Gen., David Young, Columbus, Ohio, for defendants Robert J. Kosyder and others.

Before PECK, Circuit Judge, and KINNEARY and RUBIN, District Judges.

## OPINION

PER CURIAM.

This matter is before the Court, following oral arguments, on the briefs and stipulations of the parties. At issue is the constitutionality under the Religion Clauses of the First Amendment to the United States Constitution of Amended House Bill No. 1203 (hereinafter the Act), O.R.C. §§ 5703.052, 5747.05, and 5747.11.1. The Act provides tax credits to parents who incur educational expenses in excess of those borne by parents generally in securing approved primary and secondary schooling for their children. The jurisdiction of the Court has been invoked pursuant to Title 28 of the United States Code, §§ 1331, 2201, 2202, 2281, 2283 and 1343(3), and through the federal removal statute, 28 U.S.C. § 1441 et seq.

## I

### Setting of these actions

On April 17, 1972, this Court invalidated Ohio's parental reimbursement grant statute, O.R.C. § 3317.062, on the ground that it violated the Establishment Clause of the First Amendment to the United States Constitution. Wolman v. Essex, 342 F.Supp. 399, 419 (S.D.Ohio E.D.1972), aff'd mem. 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972) (hereinafter Wolman). That act would have provided grants to parents in the sum of $90.00 for each child who attended a nonpublic school in Ohio.[1] Following this court's ruling in Wolman, the Ohio General Assembly enacted the tax credit provisions as contained in O.R.C. §§ 5703.052, 5747.05 and 5747.11.1, the constitutionality of which is now before the Court. The Act was signed into law by the Governor on June 21, 1972.

Even before this date, on June 15, 1972, Kosydar, the Tax Commissioner of Ohio, filed suit in State court seeking a declaration of the constitutional validity of the Act. Two disparate groups of

---

[1] As we pointed out in Wolman, the nonpublic school pupil population for school year 1970–71 totalled 334,420 of which 98% attended religious affiliated schools and the remaining 2% private non-sectarian ones. Of the 98% in attendance at nonpublic parochial schools, 95% attended schools affiliated with the Catholic religion. Id., at 403–405. Ohio's nonpublic school student population represents approximately 13% of the state's total student population of nearly 2.8 million. The nature of nonpublic religious-oriented education in Ohio was stipulated in Wolman, at 420–426. As there has been no claim that the nature of this educational experience has changed since that opinion, those stipulations will be deemed fully applicable to the case at bar.

defendants were joined in the action filed with the Common Pleas Court of Franklin County, Ohio: The "Grit defendants" were characterized in the complaint as "parents of children . . . who receive tax credits under [the Act]" and who claimed that their constitutional rights would be violated if they were prohibited from receiving the tax credits provided for therein; the "Wolman defendants," to the contrary, where characterized in the complaint as members of a class of citizens and taxpayers "who dispute the constitutionality of [the Act] and threaten to cause the courts to enjoin implementation of said legislation."

On June 16, 1972, the Wolman defendants removed the action to this Court, and by supplemental pleadings requested the convening of a three-judge court pursuant to 28 U.S.C. §§ 2281–2284. By order of Judge Rubin dated June 30, 1972, this suit was deemed to raise a substantial constitutional question within the meaning of 28 U.S.C. § 2281 et seq. The present panel was designated by the Chief Judge of this Circuit by Order of July 5, 1972.

■ On June 27, 1972, the "Grit defendants" moved for the remand of this case to the State court on the ground that the action had been improperly removed because not all of the defendants had joined in the removal petition. Following briefing on the question, this panel, by Order dated August 10, 1972, denied the motion to remand, and for reasons stated in that Order, realigned the "Grit defendants" (hereinafter the realigned parties) as party plaintiffs.[2]

Contemporaneously with the above described events, the Wolman group filed Civil Action 72–222 in this Court against Kosydar and the Grit defendants, seeking the convening of a three-judge court and a declaration of unconstitutionality of the Act. The present panel was designated to hear this case as well. The two cases were set for consolidated oral argument and were tentatively ordered consolidated. Because of the unusual procedural posture, no challenge has been raised as to the standing of the *Wolman* group to represent the interests of their class under the doctrine of Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); also see Wolman, 342 F. Supp. at 401.

■ This Court has been urged to decline jurisdiction under the abstention doctrine of Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Because there is no dispositive state law claim raised, ambiguity in the Act itself or administrative interpretation of the Act which might avoid, modify, or obviate the federal constitutional question which is clearly presented, we decline to do so. See, Lake Carriers Association v. Mac-Mullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Gay v. Bd. of Registration Commissioners, 466 F.2d 879 (C.A. 6 1972); Garvin v. Rosenau, 455 F.2d 233 (C.A. 6 1972).

## II

### The Statute

The challenged statutory provisions, amended sections 5703.052 and 5747.05 and enacted section 5747.11.1 O.R.C., differ in several respects from section 3317.062 O.R.C., the parental reimburse-

---

2. In addition to the reasons outlined in our earlier Order, it was the Court's view that realignment was required because the Attorney General's office and plaintiff Kosydar claimed to take a neutral stance towards the outcome of the litigation, and were content to allow the two, distinct groups of defendants to argue the substantive constitutional issues. The jurisdictional requirement of a true "case or controversy" within the meaning of Article III of the Constitution, therefore, further mandated the realignment of the parties. See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239–241, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

ment grant statute previously held unconstitutional in *Wolman*. Rather than conferring in all instances outright monetary grants, these provisions allow to qualified recipients a tax "credit" which may not exceed the total sum a taxpayer owes, after other exemptions and deductions, under the new state income tax (§ 5747.02 O.R.C.); state sales tax (Chapter 5739 O.R.C.); state personal property excise tax (Chapter 5741 O.R.C.) and "[t]he total real property taxes paid during the taxpayer's taxable year on all real property owned by the taxpayer in this state." Section 5747.05 (C)(3), O.R.D. The credit is a dollar-for-dollar rebate, which, like § 3317.062 O.R.C., is in a maximum amount of ninety dollars ($90.00) per pupil per year for school years 1971–72 and 1972–73, and which may be used to offset directly the sum total of state and local property taxes which a taxpayer owes.

Where a taxpayer's tax liability under the state income tax alone exceeds, after other exemptions and deductions, the maximum benefit to which he is entitled under the statute ($90.00 per child), such benefit is conferred by way of a deduction of ninety dollars ($90.00) per child from such state income tax liability. Where, however, the total amount of credit to which the taxpayer is entitled under Section 5747.05(C)(3), *supra*, exceeds his total state income tax liability, or where the taxpayer has overpaid the amount of income tax owing, he is authorized by the statute to receive a monetary refund from the state, payable out of the "tax refund rotary fund." Section 5703.052, O.R.C. In no event may the total tax refund exceed the sum of the income, sales, excise and property taxes which are paid by the taxpayer during the tax year.

State monies have evidently already been appropriated for the rotary fund. To the extent that the fund becomes depleted by the payment to individuals of tax refunds, monies derived from current sales and excise tax receipts, pursuant to Sections 5739.02 and 5741.02 O.R.C., may be used to replenish it.

In response to language in this Court's Opinion in *Wolman*, an attempt has been made by The Ohio General Assembly to broaden the class of recipients eligible for aid under the new tax credit provisions. Thus, in addition to parents who send their children to nonpublic Ohio schools meeting minimum requirements under Section 3321.07 of the Ohio Revised Code and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the following classes of persons are now also eligible for tax benefits: (a) Persons enrolled in home instruction programs pursuant to section 3321.04(A) (2) or 3323.05, O.R.C.; (b) Persons enrolled in public adult high school continuation programs under section 3313.-531 O.R.C., schools for tubercular persons under section 3313.55 O.R.C., and vocational and basic literacy programs pursuant to sections 3311.211 and 3313.-641, O.R.C., to the extent that tuition is charged such persons and not paid for by local school districts; (c) Persons who pay non-resident public school tuition payments pursuant to section 3317.-08, O.R.C.; and (d) Persons, other than inmates and patients at state institutions and hospitals, who incur tuition or fee expenses in public or private programs for the deaf, blind, crippled, emotionally disturbed, neurologically handicapped, or mentally retarded. The actual statistical and legal effect of this broadening of class will be discussed in some detail in subsequent portions of this opinion. See pp. 759–762 *infra.*

Finally, in an attempt to avoid the kind of political entanglement inherent in the discretionary appropriation provisions of the former statute, the General Assembly has written into Section 5747.05(C)(2) the following language:

Subject to the limitation in Division (C)(3) of this section, the credit allowed under this division for expenditures for the 1971–72 and the 1972–73 school years on behalf of any person shall not exceed ninety dollars expended for or on behalf of such person. For the 1973–74 school year and each school year thereafter, the maximum

credit allowed to a taxpayer per person under this division shall be increased over the amount allowed for the preceding school year by an amount equal to the statewide average increase in expenditures per pupil in public schools under Section 3317.02 of the Revised Code, calculated by comparing the statewide average per pupil expenditures for the school year ending in the taxable year and the preceding school year, but the increase for any school year shall not exceed twenty-five per cent of the maximum credit allowed for the preceding school year. The credit to a taxpayer per person allowable under this division for any school year shall not exceed fifty per cent of the statewide average expenditure from all sources for current expenses per public elementary and secondary school pupils for the school year ending in the taxpayer's taxable year.

The effect of these provisions under entanglement doctrine are discussed *infra*, at 766–767.

### III

### UNDERLYING PRINCIPLES OF LAW

The views of this Court towards the connate principles underlying the Establishment Clause were set forth in some detail in *Wolman* and will not be fully repeated here. We held in *Wolman* that direct monetary grants to the parents of the nonpublic school group violated the First Amendment. Our views and holding in that case are, of course, fully incorporated herein. The only novel question raised in the present suit is whether consistent with the Establishment Clause the state, through the use of its taxing machinery, can confer benefits by way of tax credits upon a class of persons composed of parents of all nonpublic school students and a specialized segment of the public school population. Upon the state of the record now before us, we conclude that it may not. For the reasons as outlined in *Wolman* and restated here, we hold that the statute before us is unconstitutional.

■ Once again, as in Wolman, our inquiry must be governed by the tripartite test announced in Lemon v. Kurtzman,[3] 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), (hereinafter *Lemon*) and by the plain words of the First Amendment to the United States Constitution, which provide in material part that:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

These "Religion Clauses" are fully applicable upon the states through the Fourteenth Amendment. See Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) and cases cited in *Wolman*, 342 F.Supp. at 405.

■ As we indicated in *Wolman*, the Court is willing to concede in the case at bar and in all cases arising in this area, that the legislature is responding to what it sees as a valid social purpose. The state has an important and recognized interest in maintaining minimum educational, safety and health standards in all schools operated within the state. We will assume that the present act, like the one invalidated in *Wolman*, was enacted for these worthwhile purposes. *Id.*, at 411. Where legislative findings affixed to the act now before us, we would afford them appropriate

---

3. The *Lemon* test, as reformulated by Chief Justice Burger, provides:

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . finally, the statute must not foster 'an excessive government entanglement with religion.'" (Citations omitted).

403 U.S. at 612–613, 91 S.Ct. at 2111, also see *Wolman*, 342 F.Supp. at 410.

deference. *Lemon,* 403 U.S. 602, 91 S. Ct. at 613; *Wolman,* 342 F.Supp. at 411.[4]

■ Since the *primary* purpose of a statute can rarely be successfully challenged in court, the tripartite *Lemon* test will, almost invariably, be deemed satisfied or violated by examining the relationship of the primary effect of the given statute to its potential for entanglement.[5] While *Lemon* was decided entirely on entanglement grounds, we suggested in *Wolman* that the apparent relationship between the second and third prongs of the test could be described in terms of the class affected by the statute. We there stated that:

A review of the [United States Supreme Court] cases seems to indicate that "neutrality" and "entanglement" exist in an inverse relationship with each other: where there is little evidence that a statute has a predominately neutral purpose and effect, as where the affected class is small or predominately sectarian, courts have scrutinized the statute to see if it engenders excessive entanglement. See *Lemon, supra.* Conversely, where the

---

4. We have already suggested in *Wolman,* that the first prong of the three prong *Lemon* test, namely that the statute has a secular legislative purpose, "will almost invariably be satisfied in cases of this type and may not truly exist as a distinct, dispositive requirement." 342 F.Supp. at 411, n. 13. This does not reflect anything unusual about First Amendment cases. Courts are, in general, highly reluctant to scrutinize a legislature's motivation or predominant purpose for enacting a given law. See Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Griffin v. Prince Edward County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). The reasons for this deferential attitude on the part of the judiciary is in part generated by courts' respect for a coequal branch of government, and in part is necessitated by the futility of attempting to supervise this aspect of the legislative process. Even assuming that a dominant or sole legislative motivation is always ascertainable, there is a certain disutility for a court invalidating a law merely on the ground of improper motivation. This approach leaves unadjudicated the substantive merits of the law itself and allows the legislature to redraft an identical law in a less forthright fashion. In addition, in those states where legislatures keep journals of their proceedings (which Ohio does not), such an approach might well inhibit free and open debate or discourage the accurate keeping of records. See Palmer v. Thompson, *supra,* 403 U.S. at 225, 91 S.Ct. 1940; United States v. O'Brien, *supra,* 391 U.S. at 384, 88 S.Ct. 1673; Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110

(1960). Presumably to avoid such results, the Supreme Court has recently adopted a view which looks only to the *effect* of a given law on protected rights, see Wright v. Council of City of Emporia, 407 U.S. 451, 461–462, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); United States v. Scotland Neck Bd. of Education, 407 U.S. 484, 492, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972) (Burger, C. J., *concurring*).

As examples of the differing views of commentators in this area, compare Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.S. 1205 (1970) (judicial inquiry into legislative motivation generally improper), with Brest, Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motivation, 1971 Supreme Court Review 95 (judicial inquiry into motivation generally proper); also see Dimond, School Segregation in the North: There is but One Constitution, 7 Harv.Civ.Rights—Civ.Lib.L.Rev. 1, 9–10 (1972).

5. As we noted in *Wolman,* the entanglement doctrine contains several distinct aspects:

In the context of 'administrative entanglement,' it focuses upon the use to which the aid is put, the form in which the aid is provided, to whom it is directed, and the extent to which the state must intervene to ensure that moneys provided are being used for constitutionally permissible secular purposes . . .

'[P]olitical entanglement' . . . requires an inquiry into the level and nature of political activity such aid may engender and an analysis of the possible consequences of such political activity fractionalizing the electorate along religious lines. *Id.,* 342 F.Supp. at 413.

indicia of neutrality are high, as in *Walz, supra,* because the affected class is broad and internally pluralistic, the inquiry into entanglement has been less strict.

342 F.Supp. at 413. We reached these conclusions after noting that "one method of gauging the neutrality of a statute, in terms of the Religion Clauses, is to observe the class to which it is directed and that will be affected by it," *id.,* at 412; and further noted that in those cases where the Court has upheld legislation attacked on Establishment Clause grounds, the affected class has been extremely broad and internally pluralistic. See, for example, Everson v. Board of Education, *supra;* Central School District v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Walz v. Tax Commission, *supra;* Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed. 2d 790 (1971).

■ The sectarian nature of the class affected by the statute is not a *per se* ground for invalidating the law under the Establishment Clause, but necessitates further inquiry under the entanglement doctrine. See *Wolman,* 342 F.Supp. at 414–415, n. 20. Where the affected class of a legislative enactment is a broad and internally pluralistic one, then, as a matter of law, the primary effect of such a statute is not the advancement of religion, and strict judicial inquiry into such statute need be had only along the rubric of administrative, and not political entanglement. See Tilton v. Richardson, *supra,* 403 U.S. at 688, 91 S.Ct. 2091.

■ Where the state provides secular services generally, as where it provides police or fire protection to all schools including religiously affiliated ones, or bus transportation to all school students, including those attending parochial schools, the benefits flowing to organized religion are remote, minimal and incidental and not different from the benefits flowing generally to society. Not only are services of this kind religiously neutral in terms of effect, but they do not relatively advantage persons because of their religious identities. In this situation, it cannot seriously be maintained that there is a "genuine nexus" between the state activity and the establishment of religion. Walz v. Tax Commissioner, *supra,* 397 U.S. at 675, 90 S.Ct. 1409.[6] Religion benefits from these publicly provided services only incidentally and only to the extent society has decided that it is desirable to maintain police, fire and transportation for all its constituent members. If the political process decides to amend its laws relative to the maintenance of these public facilities, by either increasing the level of services offered or decreasing them because of fiscal necessity, the political debate on these questions will almost surely not be drawn along religious lines. The bus transportation provided in *Everson,* the textbooks allowed in *Allen,* the property tax exemptions permitted in *Walz,* and the construction grants extended in *Tilton,* because they were extended to the broadest relevant class and because they were essentially secular in use terms, advanced religion only indirectly and incidentally. The dangers of religious fragmentation were, in each of these cases, minimal, and the Court had only to examine the administrative machinery of the statutes involved to insure that the benefits would be conferred in a neutral fashion.

■ Conversely, where the affected class is predominately religious or sectarian and the benefits provided are not inherently ideologically neutral, as where the state provides monetary grants to parents or institutions belonging to a class that is essentially religious in character, then, as a matter of law, the primary effect of such a statute is to advance religion, and the statute must be closely scrutinized for possible entanglement effects, primarily in terms of *political* entanglement. In our view,

6. Of course, if the state provided a religiously significant service generally, as for example, if it subsidized the purchase of a religious icon for each member of the society, the breadth of the class would not legitimate this activity.

when a legislative enactment uses religion as an operative criterion or benefits one or more religious groups disproportionately to the community at large, it is highly suspect,[7] and in all likelihood will be unable to survive such scrutiny.

■■■■■ The reason for this conclusion must also be apparent. When a state transfers a part of its revenues to a class that is overwhelmingly sectarian without adequate controls on the use to which this money may be put, a substantial likelihood arises that it is directly assisting religious enterprises in a fashion prohibited by the First Amendment. It is of little significance that the affected class is composed of numerous religions, although this is somewhat more desirable than where the state selects one religion for special treatment.[8] The Establishment Clause prohibits the state both from attempting to assist its religious citizens in relation to its nonreligious ones, see School District of Abington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Everson v. Board of Education, *supra*, 330 U. S. at 15–16, 67 S.Ct. 504, and from benefiting one religion as against another. See, Gillette v. United States, 401 U.S. 437, 450, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Lemon, supra; Wolman, supra;* United States v. Crowthers, 456 F.2d 1074, 1079 (C.A. 4 1972).

Our nation has historically sought to avoid the possibility of an electorate voting out of religious convictions rather than political understanding. The Religion Clauses, no less valid today than at the time of their adoption, clearly instruct us that religion is an impermissible predicate for the actions of state and that laws, which on the one hand punish or on the other hand benefit

7. The Supreme Court has dealt with numerous cases in which suspect classes were created by the legislature. See, for example, James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1965); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Harper v. Virginia, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1955). These classes must ordinarily be justified by a heavier burden and showing of state necessity. See Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); McLaughlin v. Florida, 379 U. S. 184, 196, 85 S.Ct. 283, 13 L.Ed. 2d 222 (1964); Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Anderson v. Laird, 466 F. 2d 283, 302–303 (C.A.D.C.1972) (Leventhal, J., concurring). This mode of analysis has been explicitly adopted in cases arising under the Free Exercise Clause. See Wisconsin v. Yoder, 406 U.S. 205, 214–215, 220–221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951).

8. Establishment of religion in classical historical terms would involve the creation of a single, state-supported church as existed in some of the American colonies and still exists in parts of Europe, South America, and Asia. For a review of religious conditions during the lives of the Founders, see Everson v. Board of Education, supra, 330 U.S. 1 at 8–15, 67 S.Ct. 504 (per Black, J.); also *id.*, at 33–44, 67 S.Ct. 504 (Rutledge, J., dissenting); Engel v. Vitale, 370 U.S. 421, 431–435, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); School District of Abington v. Schempp, 374 U.S. 203, 211–216, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); McGowan v. Maryland, 366 U.S. 420, 465, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (opinion of Frankfurter, J.). The present standard in the country is more strict and prohibits those acts of state which, far from actually establishing religion, may merely tend towards this result. As stated recently by the Chief Justice: "A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111 (emphasis in original).

persons because of their religious views or affiliations, are each equally repugnant to our fundamental concepts of ordered liberty.

 The Founders wisely foresaw at least this when they enacted the First Amendment: a law which extends material benefits to citizens because of their religions runs the great risk of having these citizens see their rights as dependent upon their religious identity, and the threat of restricting these rights as an attack on their religion itself. While a law which benefits people generally, as one which provides for transportation to all school age children, can be debated in its myriad aspects with little likelihood of the discussion bogging down in religious niceties, it is virtually inconceivable that a law benefiting citizens along religious lines or because of their status as members of religious sects can be placed in the legislative arena without greatly increasing the risk of promoting religious rancor and acrimony. When a statute has the effect, under prong two of the *Lemon* test, of conferring benefits to predominately religious groups, clear and convincing evidence must be adduced that such risk will not be increased. See cases cited *supra,* at n. 7.

## IV

### Application of Principles to the Statutes at Bar

Two distinct arguments in support of the constitutionality of the present statute have been advanced: *First,* problems which arise under the Religion Clauses when the state makes affirmative grants to a predominately religious class of recipients are somehow vitiated when, instead, the state's taxing machinery is employed to confer benefits. This position seems to be that legislation can be insulated from First Amendment scrutiny by the employment of the state's taxing power; *Second,* it is contended

that the class affected by the present statute is significantly broader than the class benefited by the parental reimbursement law invalidated in *Wolman.* These arguments will be discussed separately.[9]

### A.

 States, as a general rule, have broad powers to grant, within the parameters of the equal protection clause, various tax benefits and incentives, see Allied Stores of Ohio v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed. 2d 480 (1959); Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937); Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246 (1934), and to create legislative categories generally, see Dandridge v. Williams, 397 U.S. 471, 484–487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Goesaert v. Cleary, 335 U.S. 464, 69 S. Ct. 198, 93 L.Ed. 163 (1948); Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). These powers are not so great, however, as to allow the states to override other constitutional protections. Griffin v. School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Green v. Kennedy, 309 F.Supp. 1127 (D.D.C. 1970) (three judge court), app. dism. sub nom. Coit v. Green, 400 U.S. 986, 91 S.Ct. 460, 27 L.Ed.2d 435 (1971); Green v. Connally, D.C.D.C., 330 F.Supp. 1150, aff'd 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1972); Falkenstein v. Department of Revenue, 350 F.Supp. 887 (D.Or.) (three judge court). The First Amendment does not provide that "Congress shall make no law respecting an establishment of religion, except by way of tax credits." We think that the law is clear that tax exemptions, deductions and credits, like reimbursement

---

9. The realigned parties further contend sufficient checks have been provided by the statutory scheme to protect against the political divisiveness which the Re-

ligion Clauses forbid. This argument will be discussed in Part VII, *infra,* at 766–767.

grants, are all benefits conferred by the state [10] and that they may not be employed in a fashion which impedes pub-

lic policy or violates constitutional protections. See Griffin v. School Board, *supra*; Green v. Kennedy, *supra*.[11] Al-

10. It has been recently noted that:

Under the Internal Revenue Code, the United States gained an interest in "all income from whatever source derived," and that no item might be deducted from gross income unless specific authorization for its deduction was given by Congress. *Deductions from gross income depend "upon legislative grace, and only as there is clear provision therefor can any particular deduction be allowed,"* . . . *[B]y allowing deductions for contributions to segregated schools, Congress gave or bestowed money over which it had control and authority; thus, it might well be said that through the operation of the Internal Revenue Code, under which segregated private schools qualified for tax benefits, the Internal Revenue Service bestowed upon them a 'grant' of federal financial assistance.* [emphasis supplied] Annot. Segregated Private Schools—Tax Benefits, 7 A.L.R. F.2d 548, 555 and nn. 13–15 (1971) quoting the Report of United States Commission on Civil Rights, Southern School Desegregation—1966–7, at 234–5 (1967). Also see Note, New Trends in Education and the Future of Parochial Schools, 57 Cornell L.Rev. 256, 263–269 (1971).

11. The realigned parties have attempted to limit the applicability by analogy of Griffin v. School Board and Green v. Connally, *supra*, both of which involved the attempted use of tax credits and exemptions to further private segregated schools. The state argues, first, that the courts in those cases found that such aid was extended on the basis of a constitutionally impermissible motivation; and second, that the interdiction of state support for segregative activities, unlawful under the Fourteenth Amendment, stands at a higher constitutional plateau than does the enforcement of the Establishment Clause. See Brief of Realigned Parties at 24–26; Post-trial brief of Realigned Parties at 15–18.

We have noted above, *supra*, at 8, n. 4 in response to the former point, that the Supreme Court has recently disavowed any intent of having the *Griffin* principle rest on the ground of impermissible motivation. See Palmer v. Thompson, *supra*, 403 U.S. at 225, 91 S.Ct. 1940. Certainly, it cannot be argued that *Green* was decided on this ground. Rather, the extension to segregative academies of tax benefits created by sections 501 and

170 of the Internal Revenue Code resulted in *Green* in constitutionally prohibited *effects* which were invalidated by that court. Both *Griffin* and *Green* must be seen as falling within the traditional judicial function of scrutinizing the effect of legislative pronouncements on constitutional rights.

The state's second argument is that Fourteenth Amendment violations are calibrated on a posited constitutional hierarchy at a higher level than are other constitutional violations. This position has some support in *Green, supra;* also see Giannella, *Lemon* and *Tilton*: The Bitter and Sweet of Church-State Entanglement, 1971 Supreme Court Review 147, 196–197. In *Green* the taxpayers who intervened claimed that if the Court denied the tax benefits under the statutes in question, then it would logically have to deny them under the Establishment Clause, to churches and religious contributors. In meeting this argument the *Green* court did suggest that the state's interest in eradicating racial discrimination and in avoiding the grant of even indirect economic benefit to institutions that foster segregation "is dominant over other constitutional interests to the extent there is a complete and unavoidable conflict." 330 F.Supp. at 1167; also *id.*, at 1168–1169.

To the extent this argument merely restates the Chief Justice's observation that under the Religion Clauses "there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference," see *Walz*, 397 U.S. at 669, 90 S.Ct. at 1412, we are in agreement with the views expressed in *Green*. (But cf. Moose Lodge v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) which suggests there is some play in the 14th Amendment area as well.) However, to the extent it is argued that the Constitution embodies an absolute hierarchy of values in which the Equal Protection Clause holds a preferred position, we do not think the argument is well taken. If anything, it has been suggested elsewhere that rights protected by the First Amendment occupy a preferred position in our constitutional scheme. See Murdock v. Pennsylvania, 319 U.S. 105, 115, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); also see California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L. Ed.2d 342 (1972) (Marshall, J., *dissenting*).

so see Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966); Tank Truck Rental, Inc. v. Commissioner of Internal Revenue, 356 U.S. 30, 78 S. Ct. 507, 2 L.Ed.2d 562 (1958); Falkenstein v. Bureau of Revenue, *supra*; and cases collected in *Wolman*, 342 F. Supp. at 415–416. Therefore, while it is not subject to argument that property tax exemptions for religious institutions were upheld in *Walz*, these exemptions appear not to have been upheld merely because they were exemptions but rather because they were extended generally to a large and neutral class of beneficiaries.

*Walz* involved the constitutionality under the Religion Clauses of a provision of the New York State Constitution and its implementing statute which granted complete state property tax exemptions to a broad class of private, non-profit charitable, educational and religious institutions.[12] In affirming the constitutionality of the New York scheme, Chief Justice Burger, writing for a majority of five justices (Justices Brennan and Harlan concurred separately,

Justice Douglas dissented) noted the great breadth of the affected class:

The legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its "moral or mental improvement," should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes. It has not singled out one particular church or religious group or even churches as such; rather it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups. The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification

---

The basis in *Walz* for allowing property tax exemptions to churches, along with beneficent, quasi-public institutions generally, was the very conclusion that in so doing there was no violation of the Establishment Clause or of other constitutional provisions. This case should not be set off in sharp, constitutional relief to *Green*, where there was an affirmative finding that the allowance of tax benefits to segregative academies denied black children the equal protection of the laws in violation of the Fourteenth Amendment. Once a court finds that a given law tends towards the violation of the constitutional exhortation which commands that there be "no law *respecting* an establishment of religion," see *Lemon*, 403 U.S. at 612, 91 S.Ct. at 2111 (emphasis in original), that law is void, no more or less so than a law that violates the Fourteenth Amendment or any other provision of our fundamental charter.

12. Article 16, § 1 of the New York Constitution, provides in relevant part as follows: "Exemptions from taxation may be

granted only by general laws. Exemptions may be altered or repealed except those exempting real or personal property used exclusively for religious, educational or charitable purposes as defined by law and owned by any corporation or association organized or conducted exclusively for one or more of such purposes and not operating for profit."

Section 421, subd. 1, of the New York Real Property Tax Law, McKinney's Consol. Laws, C 50-a, which implements Article 16, § 1, provides in material part as follows: "Real property owned by a corporation or association organized or conducted exclusively for the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, public playground, scientific, literary, bar association, medical society, library, patriotic, historical or cemetery purposes . . . and used exclusively for carrying out thereupon one or more of such purposes . . . shall be exempt from taxation as provided in this section."

useful, desirable, and in the public interest.

*Id.,* 397 U.S. at 672–673, 90 S.Ct. at 1413.

The Chief Justice also commented that the New York statute did not violate the "benevolent neutrality" that the Religion Clauses command must exist between Church and State because the granting of tax relief to religious institutions, along with "nonprofit hospitals, art galleries . . . libraries . . ." and the like, did not create a "genuine nexus between tax exemption and establishment of religion." *Id.,* at 669–671, 675, 90 S.Ct. at 1414. The benefits which accrued to organized religion were no more than the *"incidental* benefits" accorded broadly to many exempt sectarian and nonsectarian organizations. *Id.,* at 671, 676, 90 S.Ct. at 1412, 1415 [emphasis supplied]. Indeed, the exemption for religious institutions created "only a minimal and remote involvement"; less, in fact, than would ensue were the state to actively tax the churches to support secular functions. *Id.,* at 676, 90 S.Ct. at 1415. For example, were the state to tax churches and church related institutions, those unable to pay property taxes might be forced into abrasive foreclosure proceedings. This would increase, rather than decrease, the level of entanglement attendant upon allowing churches to remain in their exempt status.

Finally, the Chief Justice, quoting Justice Holmes to the effect that "a page of history is worth a volume of logic," New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921), noted that historical-ly, at least since the time of the Founders, churches and religious property have been exempt from state and federal taxes. See *id.,* 397 U.S. at 676–678, nn. 4–8, 90 S.Ct. at 1415, 1416. It was the opponents of the exemption in *Walz* who were attempting to unsettle the historical *status quo* of Church and State.[13]

■ While it is true that the three writers in the majority all commented on the relative passivity of tax exemptions as opposed to direct money subsidies, see *id.,* at 675, 90 S.Ct. at 1414 (per Burger, C. J.); 690–691, 90 S.Ct. 1422–1423 (Brennan, J., concurring) and 699–700, 90 S.Ct. 1427–1428 (Harlan, J., concurring), it would not be correct to conclude that *Walz* stands for the broad proposition that aid provided to religion by tax exemptions is, as a general matter, constitutionally permissible. If, for example, the state were to provide tax exemptions to Baha'i temples or to individual Hindu taxpayers, in pursuit of its policy of maintaining religious diversity, it could not be seriously argued that *Walz* would shield such a law from First Amendment nullification. Such a law would involve the state in the direct and unprecedented promotion of religion and the Establishment Clause would stand as an absolute bar regardless of the means adopted by the state for the attainment of its prohibited goal. See, Abington v. Schempp, *supra*; Engel v. Vitale, *supra*; also see Anderson v. Laird, 466 F.2d 283, 290 (C.A.D.C.1972) (Bazelon, C. J., concurring), cert. den. 409 U.S. 1076, 93 S.Ct. 690, 34 L.Ed.2d 665 (1972).

---

13. Both Justices Brennan and Harlan also commented extensively on the historicity of the exemption and on the breadth of the class to which it applied under New York law. See Walz v. Tax Commissioner, *supra,* 397 U.S. 664, 681–689, 692–694, 90 S.Ct. 1409, 1417–1422, 1423–1424 (Brennan, J., *concurring*); *Id.,* at 696–700, 90 S.Ct. at 1425–1426 (Harlan, J., *concurring*). Justice Harlan emphasized the importance of the breadth of the class when he wrote:

"Neutrality in its application requires an equal protection mode of analysis. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders. In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter." *Id.,* at 696, 90 S.Ct. at 1425.

The realigned parties have further argued that Sections 501[14] and 170[15] of the Internal Revenue Code of 1954, 26 U.S.C. §§ 501, 170 provide precedents for the constitutionality of the statute before us. Like the statute before the Court in *Walz*, however, Sections 501 and 170 extend federal income tax benefits to a broad class of beneficiaries and donors. Section 501 grants a total exemption to a similar category of non-profit institutions, including religious ones, as were exempted from state property taxation in *Walz*. Its constitutionality was strongly suggested in *Walz*. *Id.*, 397 U.S. at 676, n. 4, 90 S. Ct. at 1415. Section 170 grants federal income tax deductions to individual taxpayers who make contributions to institutions similar to those exempted by Section 501. The question whether Section 170 is unconstitutional, insofar as it might tend to advance religion, has not been directly decided by the Supreme Court.

To the extent, however, that Section 170 permits individual taxpayers to deduct from their federal tax liability a portion of the contributions that they have made to Section 501-type institutions, and to the extent Section 501 institutions comprise a broad and pluralistic class of general eleemosynary nonprofit organizations including churches,

Section 170 does not have a facially predictive effect. A Section 170 donor is as likely to donate money to his church as to his favorite art museum; to the refurbishing of his temple as to the improvement of the local symphony orchestra. To borrow a phrase used by the Supreme Court in a totally different context, Section 170 on its face is not "outcome determinative" of an individual's charitable contributions. See Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); Byrd v. Blue Ridge Electric Co-op., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). It is not foreseeable from the face of Sections 170 and 501 that the prime beneficiary will be organized religion or a particular religion in relation to the other social activities and institutions included within the parameters of these statutes.[16]

### B.

The General Assembly has made a concerted effort to broaden the class of beneficiaries eligible for aid under the present Act. The present statute adds to the core *Wolman* class several additional categories of beneficiaries who expend money in excess of that spent generally by public school

---

14. See Section 501(a), (c)(3) and (d) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(a), (c)(3) and (d).

15. See Section 170(b)(1)(A)(i) and (iv) of the Internal Revenue Code of 1954, 26 U.S.C. § 170(b)(1)(A)(i) and (iv).

16. The state often confers benefits upon its citizens for wholly valid secular purposes. The proceeds of such benefits may in some instances be used by the individual recipient for religious ends which the state could not directly subsidize. So, for example, a veteran who receives, because of his status, a V.A. bonus, may wish to allocate part or all of such bonus for a church contribution. Due to the fact that the class is neutrally drawn, however, it is in no way foreseeable or predictable that the primary beneficiary of all veterans' contributions will be organized religion; in fact, the vast majority of veterans may use their bonuses for purposes wholly unrelated to religion. In the absence of a showing that the actual effect of this program would be to benefit religion disproportionately, it need not be scrutinized by the courts.

Similarly, it is of course conceivable that the primary beneficiary of Section 170 is, in fact, organized religion. If, for example, it were subject to proof that 95% of all charitable deductions are taken for contributions to church-related institutions or that a similar percentage of potentially eligible institutions partook of a religious character, then serious First Amendment questions might well be raised. In this area, however, it is advisable for courts to proceed on a case-by-case basis. See *Walz, supra*, 397 U.S., at 697–699 and n. 1, 90 S.Ct. at 1426–1427 (Harlan, J., concurring).

parents for specialized services such as remedial training and adult education.[17] It is evident that, even as presently expanded, the class affected by the Ohio scheme is considerably more narrow than the potential relevant class which might logically be expected to benefit from its avowed purposes.

The state has taken the position that the statute seeks to grant equitable relief to those parents who incur expenses in addition to taxes assessed against them for the support of public education. But if the legislative goal was to extend partial tax credit to parents who incur additional expenses in securing an education for their children, as the Trial Brief of Realigned Parties argues, at 12, then this benefit should logically have been extended to the parents of all school children in Ohio. The class of all parents would have been the true relevant class in terms of the argued purpose of the Act.

It can surely not be gainsaid that the typical parent in this state, and indeed generally, is inundated by costs which are directly attributable to the providing of education for his children. School age children must be clothed; books and laboratory supplies will at times become necessary; field trips and excur-

sions will be taken, at substantial cost to parents. All of these costs and many more like them can be viewed as additional to the basic cost of public education and yet none are creditable, under the Act, against the state income tax now in effect in Ohio.

Nor can public education be considered "free" in the sense that it is provided free of charge by the state. Like most vital social services, such as police and fire protection, water and sewer facilities, public education is supported by public tax money generally, without apportionment of the burden by use.[18] For the state to assert that a parent-taxpayer whose child attends public school is doing so at no cost to the parent is to ignore the fact that the public schools are supported by publicly assessed taxes. It further ignores that some parents pay more in state income, sales and property taxes than the per capita share of the public cost of educating their children.

■ The state's theory is in part related to the contention which we rejected in *Wolman*, that the parent of a nonpublic school student is performing a reimbursable service by sending his child to a private school. The theoretical implications of this argument are enor-

17. The statute invalidated in *Wolman* provided for parental grants to nonpublic school parents in Ohio. The evidence presented in that case revealed that 98% of this class was sectarian in character and that 95% of the class belonged to one religious denomination. The figures before the Court in *Wolman* were for school years 1970–71. While enrollment statistics for school year 1971–72 are not yet available, the Court has been advised by counsel that the essential character of the class has not been substantially changed. See, generally, Stipulation of Facts, Stipulations 12 and 14; also see n. 1, *supra*.

18. The provision of public education rather than a benefit conferred upon citizens, is perhaps the most important function performed by state and local governments. The value of an educated body politic in our democracy has been recognized from the earliest days of the Republic. This is

apparent from the face of Article III of the Northwest Ordinance of 1787, which provided that:

Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

This policy, which recognizes the preeminent role of education in our society, has been consistently expanded upon by subsequent legislation. See, The Morrill Agricultural Colleges Act of 1862, 7 U.S.C. § 301 et seq.; Elementary and Secondary Education Act of 1965, 20 U.S.C. § 821, et seq.; Education Amendments of 1972, .Pub.L. 92–318 (92 Cong., June 27, 1972) 86 Stat. 235, 41 U.S.L.W. 1 (1972). Also see Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Wisconsin v. Yoder, 406 U.S. 205, 238, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (White, J., concurring).

mous, for, if generally applied, it would lead to the conclusion that every individual who foregoes use of a broadly provided public service for which the general populace is taxed is entitled to reimbursement of that proportion of his burden. This simply is not the case, under our notions of general use taxation. The mere fact that one individual does not utilize a necessarily provided social service such as welfare, or that another chooses a private hospital rather than a publicly financed one, does not confer equitable standing upon that individual to petition the state for rebate of part of his tax burden. Individual citizens are not so equally situated, either in geographical or economic terms, so as to reasonably expect to derive precisely equal benefit from *every* necessary state function. Cf. *Wolman* 342 F.Supp. at 419.

For the state to allow a credit to the parent who foregoes the use of the provided public facility in order to send his child to a private school, is to grant that taxpayer a relative economic advantage when compared to taxpayers generally. Where the class which is allowed this credit is a rational, non-suspect one under traditional notions of equal protection, such as where aid is provided to the handicapped, the state should be afforded great latitude in the use of its taxing power. However, where the benefited class is suspect because of a predominately sectarian character, an addi-

tional and very strict scrutiny must be made to insure that the state has not employed its taxing powers in a manner offensive to the Religion Clauses of the First Amendment.[19] We conclude, on the evidence before us, that the class of persons who are beneficiaries of state aid under the present act remains predominately sectarian, within the meaning of our previous holding in *Wolman*, 342 F.Supp. at 412–413.

The General Assembly has included within the ambit of its amended provisions five additional groups of beneficiaries who were not covered by its prior reimbursement grant statute. These additional classes have been described in Part II of our Opinion, *supra*, at 750–751. While exact figures are not yet available, it has been made clear to the Court during oral arguments that the largest of these new groups numbers something in the nature of 20,000 pupils and that the others are substantially smaller.[20] In relation to the size of the original and overwhelmingly sectarian subclass of nonpublic school parents in Ohio, the aggregate of new beneficiaries will not alter in a meaningful fashion the sectarian nature of the recipient class taken as a whole.

The provisions now before us do not resemble, in terms of breadth of class, either the statute construed in *Walz* or the provisions embodied in Sections 170 and 501 of the Internal Revenue Code.[21] In each of these statutes, as we

---

19. Thus, the example cited to us in counsel's brief, of a tax credit for persons who are taxed specially for the maintenance of highways, but who do not use these publicly maintained facilities, raises no question of law under the First Amendment. Compare, Trial Brief of Realigned Parties, at 16–17. A statute like the one at bar might well withstand the rationality test of traditional equal protection analysis, while nevertheless succumbing to the different and stricter standards embodied in the Religion Clauses of the First Amendment.

20. In addition, it has not been made apparent to this panel that the additional beneficiaries, the vast majority of whom utilize public educational facilities, actu-

ally incur additional costs when compared to the larger relevant class. Because most of these groups have not traditionally been treated as distinct from the general public school population, separate statistics as to their numbers and their additional incurred costs are not available.

21. Compare also Section 235–57(b) of the Hawaii Revised Statutes (1971 Supp.) which provides for tax credits inverse to gross income in amounts ranging from $2–$50 to a class of parents of *all* full-time students in attendance at *all* schools in Hawaii from the elementary to the university level. See also Comment, The Sacred Wall Revisited: The Constitutionality of State Aid to Nonpublic Edu-

have indicated, it can be argued that the benefits flowing to religion do so only incidentally. To the contrary, the Ohio statute now before us still retains the class characteristics which required invalidation of its predecessor in *Wolman.* As in that case, "a substantial beneficiary [of these provisions] can only be organized religion." *Id.*, 342 F.Supp. at 413. Also see Lemon v. Sloan, 340 F. Supp. 1356, 1363–1364 (E.D.Pa.1972) (three judge court). Americans United For Separation of Church and State v. Paire, 348 F.Supp. 506, 509–510 (D.N.H. 1972). We hold, therefore, that the Act has the primary effect of advancing religion.[22] Its validity can be upheld against constitutional challenge only if the state can demonstrate by clear and convincing evidence, that the political entanglement problems which customarily attach to a law that has such an effect will be avoided.

This view is not altered by the form in which aid is conferred by the Act.

The difficulty with the present statute is that it credits money to a class of recipients solely because (and upon proof that) they have in turn paid money for a school or service covered by the statute. As we have said, the schools and services covered by the statute are predominately sectarian. It simply defies reason to say that such a statute does not aid sectarian schools. Such aid may be less direct and less capable of precise measurement than a grant to the schools themselves; yet if some parents will now be able to send their children to these schools or if fewer parents already utilizing them will be forced to withdraw their children, they will be

aided. As Judge Hays wrote, while dissenting in part from the view adopted by the majority in Committee for Public Education and Religious Liberty (PEARL) v. Nyquist, 350 F.Supp. 655 (S.D.N.Y.1972) (three judge court):

> The benefits of the tax exemption allowed by section 3 are of the same nature as those accorded under the tuition reimbursement provisions of section 2. There is no essential difference between a parent's receiving a $50 *reimbursement* for tuition paid to a parochial school and his receiving a $50 *benefit because* he sends his child to a parochial school. In both instances the money involved represents a charge made upon the state for the purpose of religious education.

*Id.*, at 675 (Hays, J., dissenting in part).[22A]

 We hold that where, as here, the recipient of state conferred benefits is a predominantly sectarian class of schools and therefore as a matter of law the primary effect of such benefits is to advance religions, then the form of these benefits, whether by tax credits, exemptions or deductions, cannot alone insulate them from First Amendment infirmity. As Mr. Justice Douglas said in *Abington, supra,* and as we recognized in *Wolman,* "[w]hat may not be done directly may not be done indirectly less the Establishment Clause become a mockery." 374 U.S. 203, 230, 83 S.Ct. 1560, 1575 (Douglas, Jr., concurring). The exaltation of form over substance no longer has any place in our jurisprudence. See N. L. R. B. v. Textile Workers, 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1972) (Blackmun, J., dissenting); Wolman v. Essex, 342 F.Supp. at 415.

---

cation following Lemon v. Kurtzman and Tilton v. Richardson, 67 Nw.U.L. Rev. 118, 140–142 (1972).

22. In our opinion an Ohio statute which confers benefits on a class composed essentially of nonpublic school students or parents, so long as that class continues to remain as outlined *supra* at n. 1 will have the primary effect of advancing religion. This holding may not necessarily be applicable in those states where the

composition of the nonpublic school population is more representative of the general population characteristics of the total school population. However, it is unavoidable in Ohio, where at the present time the vast majority of nonpublic schools are sectarian.

22A. For the reasons set forth above, we decline to follow Part III of the majority's opinion in PEARL v. Nyquist, *supra,* at 670–673.

## V

### *Specific Infirmities of the Act*

The Ohio scheme is faulty in several particular respects, in addition to the general infirmities noticed above as to class and form. While its sponsors claim that the Act creates a credit against the state income tax only, it is apparent from the face of the law that general revenue funds are to be expended in its administration. The state's theory, and one we have rejected above, *supra* at 755–757, is that partial tax exemptions granted to individual taxpayers never acquire an identity as state monies within the proscription of the Establishment Clause.[23] Even if we were to assume the correctness of this contention, the Act allows, as a credit, an amount not in excess of the *sum* of the taxpayer's state income, excise, sales, and property taxes. These three latter types of taxes in Ohio form the general revenue funds and are not segregated, in practice, to the account of individual taxpayers. To the extent a given taxpayer's refund exceeds the amount of his income tax liability alone and he obtains a credit against sales, excise and property taxes, the state is expending general fund monies to reimburse that taxpayer for a part of his costs in sending his children to nonpublic schools. Where, as here, the nonpublic schools are predominantly sectarian, such a reimbursement grant from general funds violates the Establishment Clause. We so held in *Wolman,* 342 F. Supp. at 419. We held in addition there

that "[p]ayment to the parent for transmittal to the denominational school does not have a cleansing effect and somehow cause the funds to lose their identity as public funds." *Id.,* 342 F.Supp. at 415. Invalid for similar reasons are the provisions of the Act which provide for replenishment of the tax rotary fund, upon depletion of that fund, by way of general state sales and property tax revenues.

In addition, the Ohio Act provides for tax credits rather than for total exemptions from the tax lists, exclusions from gross income or deductions for adjusted gross income. While, as the Court pointed out in *Walz* and *Lemon,* and as we pointed out in *Wolman,* direct monetary subsidies are more direct and entanglement-intensive than are exemptions, tax credits are more direct than income tax exclusions or deductions. When a state grants a total exemption, as in *Walz,* exempted institutions are no longer taxable entities and do not appear on the tax rolls of the state. In that situation there is no longer any tax relationship between the exempted entity and the state; consequently, far less danger exists, if the exempted institution is a religious one, that abrasive contacts, arising out of tax liability will occur along religious lines. Slightly more direct than exemptions are tax deductions and exclusions which tend to be inverse to income and go to reduce the base upon which a percentage tax is levied.

A tax credit, to the contrary, is a dollar for dollar forgiveness against the net payable tax as finally computed, after

---

23. Because this is its position, the state has made no attempt to structure, within the Act, mechanisms to control the use of the credited funds. As in *Wolman,* therefore, these funds could conceivably be used "for the construction of a chapel as well as a gymnasium; for the purchase of religious icons as well as laboratory test tubes." 342 F.Supp. at 414. Since the parents under this Act, as under the reimbursement act, "serve as mere conduits of public funds, the State retains a responsibility of insuring that the public moneys thus provided and which retain their public character throughout the transaction, are used for constitution-

ally permissible ends and continue to be so used." *Id.,* at 416. We expressed some doubt in *Wolman* whether general purpose aid to a sectarian class could ever overcome the "Catch-22-like relationship" that exists between the second and third prongs of the *Lemon* test. Id., at 414–415, n. 20. We need not reach this question under the circumstances of the instant case. Also see generally, Areen, Education Vouchers, 6 Harv.Civ. Rights—Civ.Lib.L.Rev. 466 (1971); Note, Education Vouchers: The Fruit of the Lemon Tree, 24 Stan.L.Rev. 687 (1972).

all exclusions and deductions have been taken. A credit, therefore, while perhaps less intensive than direct grants, tends to involve the state more directly in assisting the benefited enterprise than do either exemptions or deductions. As we will note below, they are also more entanglement-intensive. See *infra* at 766–767.

## VI

### *Free Exercise*

■ The state also asserts that this Court would be denying the parents of parochial school pupils their Free Exercise Clause rights were we to invalidate the Act as it applies to them. It is argued that the General Assembly had a rational basis for granting "partial tax relief for public and nonpublic school parents who pay education taxes but do not enjoy their benefits." It is further argued that while parents may not have had any constitutional right to be relieved of a portion of their tax burden prior to the enactment of the Act,

> [n]ow that the legislature has made this determination, serious free exercise and equal protection questions would arise if this Court were to take away nonpublic school parents' tax credit relief solely because they had elected a church-related accredited education for their children.

See Brief of Realigned Parties at 27.

■ These nubilous arguments are not persuasive to the Court. It is, of course, irrefutable that the strong social policies favoring compulsory public education cannot override, under the Free Exercise Clause, the right of sectarian groups to maintain their own network of schools. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). It is equally well settled under the Establishment Clause, however, that public funds may not be used to aid supporters of sectarian schools and certainly not in a manner which advantages them when compared to school parents generally. See *Lemon, supra; Wolman, supra.* As we indicated

in *Wolman,* the Establishment Clause stands as a bar to aid of Church schools, even though social pluralism may be enhanced and tax dollars saved by virtue of these schools' existence. *Id.,* 342 F. Supp. at 411–412, 418–419; also see *Lemon, supra,* 403 U.S. at 625, 91 S.Ct. 2105; PEARL v. Nyquist, at 669–670 of 350 F.Supp.

■ The short answer to the argument that sectarian schools benefit the general populace by reducing the expenditures needed to support the public schools is that our Constitution embodies values which override considerations of mere cost efficiencies or school savings. Cf. Stanley v. Illinois, 405 U.S. 645, 656–657, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Fuentes v. Shevin, 407 U.S. 67, 90–91, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). See also *Wolman,* 342 F. Supp. at 418–419. While the state may grant secular, neutral, non-ideological aid to sectarian school students when such aid is granted in common to all students, see *Everson, supra; Allen, supra;* also see P. O. A. U. v. Essex, 28 Ohio St.2d 79, 275 N.E.2d 603 (1971), no *right* to such aid under the Free Exercise Clause has been established in our constitutional matrix.

The broad construction of the Free Exercise Clause urged upon us by the state would for all practical purposes, render meaningless the thrust and import of the Establishment Clause. Such a construction would be at odds with the Chief Justice's remark that the "Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." Walz v. Tax Commission, *supra,* 397 U.S. at 668–669, 90 S.Ct. at 1411. The Free Exercise Clause has at times

been construed to allow individuals dispensation from general laws, where the refusal of the state to waive compliance with these laws would place a heavy burden on the utilization of Free Exercise rights, see Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Pierce v. Society of Sisters, *supra*; also see Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). It has never been interpreted as placing an affirmative duty upon the state to appropriate money so that religious beliefs might be more effectively exercised or the continuing vitality of religious institutions ensured. See Brusca v. Missouri ex rel. State Board of Education, 332 F.Supp. 275 (E.D.Mo.1971) (three judge court), aff'd mem. 405 U.S. 1050, 92 S.Ct. 1493, 31 L.Ed.2d 786 (1972); Jackon v. State of California, 460 F.2d 282 (C.A.9 1972); Von

Stauffenberg v. District Unemployment Compensation Board, 459 F.2d 1128, 1130–1131 (C.A.D.C.1972); PEARL v. Nyquist, *supra*, at 668–669 of 350 F. Supp.

Under the principles of the Free Exercise Clause, the state has an obligation to maintain *neutral* conditions in which religions may flourish and survive. However, to argue at this late date that the state under the Free Exercise Clause must also nurture or support religion is to ignore well-settled principles of Establishment Clause jurisprudence. The state does not have an affirmative duty to sustain all religions, like flies in amber, for the pluralistic interests of society. The adoption of such a view would mark a profound and radical departure from the philosophy of separation of Church and State which has characterized this country from its very inception.[24]

24. Several courts have recently rejected similar Free Exercise arguments when these were argued by proponents of aid to nonpublic schools. In Jackson v. State of California, *supra*, the plaintiff contended that if the state did not provide voucher assistance it would force him to waive his Free Exercise rights upon the enjoyment of a right to state appropriations in public schools. In rejecting this argument on *Brusca* grounds, the Court commented:

". . . parents of school-age children do not have a right to general financial assistance for education. Rather, they may, if they choose, send their children to public schools, an opportunity some parents choose to forego because it is inconsistent with their desire for non-public education. As Mr. Justice Douglas stated in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed. 2d 965 . . . '[t]he fact that government cannot exact from [me] a surrender of one iota of [my] religious scruples does not, of course, mean that [I] can demand of government a sum of money, the better to exercise them.'"
*Id.*, 460 F.2d at 283, n. 1.

And Judge Gurfein, in rejecting a similar contention made in PEARL, *supra*, summed up the meaning of the Free Exercise Clause in words with which we substantially agree:

The propagation of religious doctrine was early made the responsibility of the particular denomination in hard times as well as good times. We know, however, that inflation was no concern of the framers of the First Amendment, and as individuals, we sympathize with its victims. But a State-supported church school is simply not a part of our way of life, and the payment of tuition for its pupils makes the church school a State-supported school.

\* \* \* \* \*

The implications of recognizing a "right" to the support of public funds for the expression of the free exercise of religion are, moreover, staggering. Religious belief and the right to practice religion, including the teaching of the young are precious rights to be preserved unto death itself. But a subsidy to those who practice a particular religion to enable them to observe its tenets is not compatible with either clause of the First Amendment. If State subsidy may be given for religious education, why may it not be given to the poor for purchase of sacramental wine, or a crucifix or a Torah, a printing press for Jehovah's Witnesses, or for a trip to a Baptist convention or to hear a favorite evangelist, or for a Muslim to take his pilgrimage to Mecca. These are all "rights" to the free exercise of religion

The realigned parties have urged this Court to follow the precedent of Minnesota Civil Liberties Union v. State of Minnesota, Nos. 379526 and 380252 (District Court Ramsey County, Minn., July 6, 1972) which affirmed against state and federal constitutional challenge, a tax credit scheme designed to benefit nonpublic school parents. To the extent, however, the decision of the Minnesota court rested in part on a view of the Free Exercise Clause which we have here rejected,[24A] we decline to follow its holding. See, accord with our position, Note, Aid to Parochial Schools—Income Tax Credits, 56 U.Minn.L.Rev. 189, 226–227 (1971).

## VII

### Political Entanglement

■ It requires no special wisdom to foresee that the Act, insofar as it confers benefits upon a predominately sectarian class, increases the likelihood that further debate concerning this law will be along religious lines. See Lemon, supra, 403 U.S. at 623, 91 S.Ct. 2105. Even if couched in superficially fiscal terms, future legislative voices, both those that favor and those that oppose the Act, will, by implication and construction be debating the relative merits of religiously oriented education.

The argument that the form of the statute significantly reduces the likelihood that future debate over its provisions and appropriations will not be necessary is simply not convincing to the Court. There is just no objective significance to the legislative standard which attempts to place a maximum limitation on the credits allowable un-der the Act at 50% of "the statewide average expenditure from all sources for current expenses per public . . . school pupils." O.R.C. Section 5747.05 (C)(2), supra, at 6. Nor is there strong reason to believe that the underlying fiscal crisis facing nonpublic schools will be fully alleviated by the legislative mechanism of the Act which links the yearly increment in nonpublic school aid to the increase in the average public school pupil expenditure. We further note that even though the Act provides a mechanism by which these annual increases can be gauged, the needed incremental sums will have to be appropriated to the rotary fund by the tax commissioner. Since the tax commissioner will tap general revenues to replenish the rotary fund, a strong likelihood of annual debate over the use of public monies for the purposes of the rotary fund will remain.

The state has not demonstrated to this Court, by clear and convincing proof, that the Act will not generate political controversy along religious lines. The present provisions are in the form of a statute rather than a constitutional amendment, and are therefore relatively less insulated from political pressures and periodic adjustment.[25] The enactments of one legislature can always be considered de novo by its successor. The complexion of legislative bodies and the forces operating upon them are always subject to political change.

Secondly, and more generally, tax credits granted to a sectarian class, like direct monetary grants, exclusions and deductions, may tend to increase the likelihood of significant and continuing political controversy. Unlike a true ex-

that cannot be denied, and from the exercise of which the poor may be excluded by circumstance.

If the Founding Fathers had any intention about religion, it was surely to separate the concern of their Government from the concern of the individual religious community.

PEARL v. Nyquist, supra, at 668 of 350 F.Supp.

**24A.** See id., at 764–766.

25. This is not meant to imply that state constitutional amendments, adopted properly under state law, will necessarily satisfy federal constitutional requirements under the Fourteenth Amendment and the Supremacy Clause. Cf. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830; Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); also see Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).

emption which removes a tax entity from the tax rolls entirely, these other forms of aid must be calibrated in terms of dollar amounts or percentages and are therefore by their very nature arbitrary and changeable.

While the Act does not attempt to remedy all of the problems confronting nonpublic education, its affirmance by this Court would be the first step in a progression that could logically lead to the state's assuming the responsibility for the continued economic viability of the nonpublic schools. As Mr. Chief Justice Burger noted in *Lemon*, in language which is fully applicable at bar, when he contrasted the acts there invalidated to the one upheld in *Walz*:

> We have no long history of state aid to church-related educational institutions comparable to 200 years of tax exemption for churches. Indeed, the state programs before us today represent something of an innovation. *We have already noted that modern governmental programs have self-perpetuating and self-expanding propensities. These internal pressures are only enhanced when the schemes involve institutions whose legitimate needs are growing and whose interests have substantial political support. Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach "the verge," have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a "downhill thrust" easily set in motion but difficult to retard or stop.* Development by momentum is not invariably bad; indeed, it is the way the common law has grown, but it is a force to be recognized and reckoned with. The dangers are increased by the difficulty of perceiving in advance exactly where the "verge" of the precipice lies. As well as constituting an independent evil against which the Religion Clauses were intended to protect, involvement or entanglement between government and religion serves as a warning signal.

*Id.*, 403 U.S. at 624–625, 91 S.Ct. at 2117 (emphasis supplied).

█ Nothing that this Court has said above should be construed as implying that advocacy by religious forces on the general political problems facing our society should be disallowed or even discouraged. To the contrary, we think the political vitality of our nation would be diminished if the right of these groups to argue their views in the legislative chambers were constricted. They have added, in the past, a moral and philosophical dimension to the political debate on issues as diverse as the war in Vietnam, population control, legalization of gambling. It is to be hoped that these contributions continue into the future. We hold only that a state may not, consistent with the Establishment Clause, confer unrestricted economic benefits upon a class of a predominately sectarian character in a manner which tends to advantage them when compared to the class of general citizens. As the Chief Justice noted at the conclusion of *Lemon*:

> Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of government. *The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement is inevitable, lines must be drawn.* (emphasis supplied).

█ Insofar as §§ 5703.052, 5747.05, and 5747.11.1, O.R.C. grant tax credits to a predominately sectarian class of nonpublic school parents, they are unconstitutional under the First Amendment and should be permanently enjoined.